430 So.2d 16 (1982)
Joseph B. BROWN
v.
Douglas WHITE, et al.
No. 81-C-3251.
Supreme Court of Louisiana.
September 7, 1982.
On Rehearing April 4, 1983.
Rehearing Denied May 13, 1983.
Lawrence D. Wiedemann, Wiedemann & Fransen, New Orleans, for applicant.
A.R. Christovich, Jr., Christovich & Kearney, New Orleans, Roland J. St. Martin, LaPlace, Clarence A. Frost, Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, M. Truman Woodward, Jr., James K. Irvin, Milling, Benson, Woodward, Hillyer, Pierson & Miller, Gerald M. Dillon, Michael R. Daigle, Dillon & Cambre, New Orleans, for respondents.
*17 CALOGERO, Justice.
Plaintiff Joseph B. Brown, a mechanic employed by E.L. duPont deNemours Company at their Laplace, Louisiana plant, was injured on August 28, 1975 while working on an industrial fan.
In tort, he sued eleven so called executive officers of his employer duPont in their individual capacities and National Machinery Drying, Inc., the manufacturer of the fan. After an eleven day trial, the civil jury hearing the case returned a verdict in favor of all the defendants and against plaintiff. The Court of Appeal affirmed the lower court judgment. We granted writs on application of plaintiff.
The events leading up to the accident are essentially as follows. Plaintiff had been employed for duPont for eleven years prior to the accident. He had worked himself up to a step six mechanic, the top grade in his trade at duPont. His work assignment for eight months preceding the accident had been in the Neoprene Finishing Area.[1] On the morning of August 8, 1975, plaintiff arrived at work at approximately 7:30 a.m. He and other mechanics met with their supervisor who gave out the work assignments for the day. That morning, plaintiff, Larry Robertson, and Sam Lavigne were assigned by their supervisor, Jack Evans, to work on the number two blower in the Neoprene Finishing area.[2] Brown had no previous experience working on the blowers, but his co-workers on the assigned task had, especially Robertson. The men went to the locker room to put on their hard hats and special work shoes. At this time, Lavigne informed plaintiff that they were to change a defective pulley on the number two blower. He also informed plaintiff that both he (Lavigne) and Robertson were scheduled for some medical tests and that they would return shortly.
While Robertson and Lavigne were gone Brown began making the necessary preparations for performing the assigned job. He first went to Production personnel to have the No. 2 blower de-energized and tagged out.[3] He then went to the second floor and observed that the No. 2 blower was still turning at what appeared to him to be the same velocity as that of an energized blower.[4] Brown then went down to the maintenance shop to procure the tools with which to do the job. While there, he saw two other of his co-workers, Larry Boudreaux and Ira Marcel, mechanics who Brown knew had a great deal of experience. Brown asked these men what tools he would need for the job. Plaintiff testified that they told him he would need a wheel puller and a pipe wrench, the latter for stopping the de-energized but turning fan. He further testified that they did not explain to him how the pipe wrench should be used to stop the blower. When plaintiff *18 said to these men that this method of stopping the turning fan seemed dangerous, he testified that they responded that that was the way everyone did it.
However, Brown's testimony in this regard was not corroborated by Boudreaux and Marcel. To the contrary, they testified that they told the plaintiff that he should use a pry bar to stop the fan. Both men testified that they had either done the job or seen it done only by use of a pry bar, and that they did not tell plaintiff he should use a pipe wrench.[5]
Brown took both a wheel puller and a pipe wrench up to the second floor and placed them by the blower. He then waited for one of his assigned co-workers to return. When Lavigne returned he and Brown went to work on the No. 2 blower. First Brown and Lavigne removed the safety guard covering the motor, the two fly wheels and the belts. Brown indicated to Lavigne that he was going to try to stop the fan's turning by applying pressure to the fan belt with the pipe wrench. While trying this, the pipe wrench slipped off the belt several times. Plaintiff remarked that this was a "hell of a way to do a job," but nonetheless proceeded to try once more to stop the fan by this method.
Defendant Evans (plaintiff's immediate supervisor) testified that there were safety regulations in effect at the time of the accident prohibiting the removal of safety guards from equipment unless the equipment was inoperative. Workers were also instructed that if a job looked dangerous or if a worker did not know how to perform an assigned task they were to consult with their supervisor. This testimony was corroborated by some of plaintiff's co-workers. Plaintiff did not consult with his supervisor prior to removing the safety guard and proceeded to attempt to stop the fan from turning notwithstanding that he had remarked twice that the job seemed dangerous.
On his third or fourth try to stop the fan from turning, the teeth of the pipe wrench apparently got caught on the belt or between the belt and the fly wheel, and the wrench was projected upward striking plaintiff under the chin.
After an eleven day trial, the jury, responding to written interrogatories submitted to them by the trial judge, concluded that National Drying Machinery, Inc., was guilty of negligence, but that its negligence was not a proximate cause of the accident. They also concluded that one of the executive officers, Jack Evans, was guilty of negligence and that his negligence was a proximate cause of the accident. Finally, they found that plaintiff was contributorily negligent and that he had assumed the risk of his injury. Accordingly, the trial judge entered judgment in favor of all defendants.
The Court of Appeal affirmed the trial court judgment upon finding that the jury determinations were amply supported by the record, or at least not clearly wrong. Brown v. White, 405 So.2d 555, (La.App. 4th Cir.1981).
In application for writs in this Court plaintiff contended that the jury returned a verdict in favor of National, the manufacturer, because the trial judge had, in effect, charged the jury that contributory negligence was a defense to a strict liability claim based upon a defective product, a legal proposition with which plaintiff took issue. This assignment of error prompted our granting writs. While, as argued by plaintiff, Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (La.1971) seems to support the argument that contributory negligence is not a defense to a strict liability cause of action, some doubt as to this proposition has been cast by the recent plurality decision of this Court in Dorry v. Lafleur, 399 So.2d 559 (La.1981).
*19 After studying the record, however, we conclude that this principle issue, which prompted our writ grant, is not before us in this case. The written interrogatories which the judge presented to the jury did not specifically instruct them not to return a verdict against National in the event that they found plaintiff to be guilty of contributory negligence. Furthermore, even if the interrogatories may be construed as having effectively so instructed the jury, that is not what prompted the jury verdict in National's favor. Prior to reaching the interrogatory concerning plaintiff's contributory negligence, the jury had already absolved National of liability by finding that its negligence was not a proximate cause of the accident. Had the jury found National negligent and its negligence a proximate cause of the accident, and then barred plaintiff's recovery because of a finding that plaintiff was contributorily negligent, plaintiff's argument would be ripe for consideration.
Secondly, the trial judge did not instruct the jury that contributory negligence is a defense to a strict liability claim. He merely charged them that if the accident was solely caused by the improper use of the product, the manufacturer would not be liable.[6] Thus, although it is true that the trial judge refused to charge the jury that contributory negligence was not a bar to a strict liability claim, it cannot be said that what he did charge was equivalent to a charge that contributory negligence was a bar.
In any event, as stated above, the result reached in this case in favor of National was unaffected by any charges the judge gave on contributory negligence, because the jury did not reach that issue as relates to National, having previously decided that National's negligence was not a proximate cause of the accident.
However, since we granted writs and have the entire case before us, we shall consider plaintiff's other assignments of error even though they did not prompt the granting of writs in this case. For the reasons which follow, we find no merit in plaintiff's other assignments and affirm both lower court judgments.
As a preliminary matter, plaintiff argues that the trial judge erred in refusing to excuse a juror, a Mr. Vaughn, upon plaintiff's request for him to do so. It appears that Vaughn overheard that a settlement offer had been made to plaintiff. He immediately reported what he had heard to the trial judge. The trial judge notified all the attorneys in the case, and questioned Vaughn out of the presence of the other jurors. Vaughn, who was himself an attorney, assured the trial judge that he could decide the case impartially based on the evidence presented at trial without being affected by what he had overheard. He also swore that he would not repeat to the other jurors what he had heard. Vaughn was told that the remark he heard was not true and that no settlement offer had been made. At this point, Vaughn was allowed to remain on the jury and plaintiff did not protest.
At the close of trial, however, plaintiff's counsel moved that Vaughn, as well as another juror, be excused from the jury. The trial judge granted his motion as to the other juror but denied it as to Vaughn, being satisfied that the juror would be impartial.
Trial judges are vested with a wide range of discretion in determining the capabilities of jurors. Unless it is shown that there was an abuse of that discretion, the trial judge's ruling should not be upset. In the present case, the judge did not abuse his discretion in refusing to excuse Vaughn. Vaughn swore that the remark he had overheard would not affect his judgment and that he could be impartial. He also stated that he would not repeat what he had heard to the *20 other jurors, and there is no contention that he did so. This argument is without merit.
Next plaintiff argues that the charges to the jury concerning the plaintiff's contributory negligence were erroneous and caused the jury to come to the wrong conclusion that the plaintiff was in fact contributorily negligent.
Plaintiff's complaints about the jury charge in this regard are twofold. First he complains about the trial judge's refusal to give the second half of plaintiff's proposed charge No. 3.[7] Secondly, he complains of the trial judge's decision to give defendant's proposed charge No. 14.[8]
With respect to plaintiff's first argument, concerning his proposed charge No. 3, the trial judge gave the first half of it. He instructed the jury that the negligence aspect of the case involved a comparison of duties, that identical conduct of the parties should not necessarily be demanded, and that varying factors affect what conduct should be required of a reasonable man under the circumstances. It was only the second half of the charge which he refused to give, a portion of the charge focusing upon a higher degree of care by supervisory employees than by subordinate employees.
He did, however, give the following charge:
In determining whether an employee had been contributorily negligent, you should consider the following factors:
1. Relative knowledge of the danger by the supervising employee and the injured employee;
2. Relative control over the employee's situation;
3. The degree to which the employee's conduct is voluntary on his part;
4. Alternatives available to the employee;
5. Obviousness of the danger; and
6. Relative ability to eliminate the danger.
We do not find any error in this ruling. Rather than tell the jury that they were entitled to exact a higher degree of care from supervisory employees than from subordinates, the trial judge opted to give the jury the above factors to consider, factors which they could well have employed had they found the facts warranted same, to exact a higher degree of care from supervisory employees.
Under the circumstances there was no error by the trial judge in refusing to give the second half of the proposed charge No. 3.
With respect to plaintiff's second argument, concerning defendant's proposed charge No. 14, there is nothing inherently wrong with the charge. Indeed an employee cannot be supervised every moment. And, generally speaking, his responsibility for his own safety is equal to that of his supervisory co-employees. The charge is based upon principles established in Miller v. Employers Mutual Liability Insurance Co., 349 So.2d 1353 (La.App.2d Cir.1977).
However, the charge, applicable in a general sense, must be considered in context with other charges given by the trial judge. In this respect we note that he gave a number of charges, the effect of which was to accentuate the responsibility of supervisory employees for the safety of subordinate *21 employees. He instructed the jury, in effect, that: if an employee is required to perform a task without the equipment necessary for its safe performance then it should be concluded that the employee did not voluntarily expose himself to the risk involved; the supervisory employee cannot escape responsibility because an employee used an unsafe method of performing his duties if he was forced to do so because of a lack of safe and adequate equipment; an employee is not contributorily negligent in failing to anticipate that his employer and the engineering supervisors would subject him to an unreasonable risk of injury; and the respective duties of the employee and the supervisory employer should be determined by objective factors, considering the circumstances surrounding the accident.
Therefore, considering the charges overall, the inclusion of defendant's proposed charge No. 14 was not improper.
Furthermore, the evidence presented at trial establishes that plaintiff was contributorily negligent. With one co-employee who was also inexperienced at the assigned job, plaintiff attempted to stop the fan from turning by using a method which he devised, and which he himself remarked was dangerous. Despite the rules in force at the plant, that if any job appears dangerous the workman is to consult with his supervisor, Brown nevertheless proceeded several times to stop the fan in a manner he knew to be dangerous, without ever consulting his supervisor. Furthermore, the jury must have concluded that it was plaintiff's decision to use the pipe wrench notwithstanding advice given him by the two more experienced co-workers that he use a pry bar.[9] Finally, after making several unsuccessful attempts to stop the fan by pressing the pipe wrench on the fan belt, and each time having the pipe wrench slide from the belt, plaintiff continued to pursue this course until finally he caused the accident. Plaintiff gave as a reason for not seeking advice from his supervisor that although it was the stated policy of the company that a worker should consult with a supervisor when confronted with a dangerous or uncertain situation, those workers who frequently solicited such assistance placed their jobs in jeopardy. Plaintiff's co-workers testified that they often went to their supervisors for instructions or when something looked dangerous without any fear of being fired and that the supervisors were helpful.
The jury made the finding that plaintiff was negligent and that his own negligence was a proximate cause of the accident, barring his recovery against his supervisor, Jack Evans, whom the jury also found to be negligent. Based on our review of the record, we simply cannot conclude that the jury was clearly wrong in that determination.
Next plaintiff argues that the jury erred in finding that the plaintiff assumed the risk he encountered. Like the Court of Appeal, because of our finding that there was no error in the jury determination that plaintiff was contributorily negligent we need not consider the jury's finding regarding assumption of risk since plaintiff's recovery is barred, irrespective of the jury's finding on that issue.

Decree
For the foregoing reasons the judgments of the trial court and the Court of Appeal are affirmed.
AFFIRMED.
DIXON, C.J., concurs in the result.
LEMMON, J., dissents.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
The majority errs in its appreciation of the facts.
Co-employee Lavigne was far from inexperienced at the assigned job. He was *22 working in his "primary area". (Tr. 118) Lavigne had worked on the blowers and seen ten or twelve other mechanics work on them. Lavigne "didn't think there was anything unsafe in what we were doing." (Tr. 274) Lavigne removed the front safety guard. (Tr. 241) Plaintiff did not, contrary to the majority's statement. Just before Brown's accident, Lavigne wanted a try. It was Brown's bad luck that he tried one more time himself.
The proper way to perform the job was to turn off the opposite fan. When Richard Andrew Ory, a step six mechanic and operator with three and a half years of college did this, foreman Evans was very upset. Ory was instructed that the job should be done by friction with a block of wood and a long pry bar. Ory told Evans that he did not think that was safe because of the amount of torque behind the shaft, but Evans insisted.
The statement that Evans' method did not require removal of the safety guard (page 18) is disputed. Ory said the front cover still had to be removed (Tr. 162). Evans specifically admitted that the report on Brown's accident said there were no written instructions or verbal lineup about this job.
Only one other mechanic, Ory, had once refused to use a friction method of stopping the fan. Brown's use of friction was reasonable, in accord with established custom, and unsafe only because this feature of his work was unsafe.
The majority indicates that Brown was negligent in using a wrench instead of a pry bar. However, both were unsafea fact admitted by duPont after Brown's accident. Brown did not devise a new method of stopping the fan. He was using a variation of the friction method in use. The fact that he used a wrench instead of a pry bar is irrelevant.
The burden of pleading and proving contributory negligence rests with the defendant. Defendant here failed to prove that Brown did not act like other reasonable men of ordinary prudence under like circumstances. Every other mechanic in the plant testified that the fan had been stopped by applying friction.
Brown was a dependable, reliable and able employee who worked carefully. He, like Ory, thought the friction method was dangerous but was told that was the way to do the job. He had no reasonable alternative.
It was only after Brown's accident that the safety people at duPont decided that the past procedures used were unsafe. The ineptitude of the past methods is shown by the experience of Jerry Neal Robinson who once tried to stop it with a pry bar and a two by four which broke. Mike Tolle, a mechanical engineer with a bachelor of science, was maintenance supervisor and his impression was that a two by four was used to stop the windmilling of the fan. Robinson and co-worker, Kenny Granier, had better luck with a four by four and a pry bar, holding the blower with a wrench after it had been stopped. Sherry Alexander, a shift mechanic, used a piece of four by four oak wood and a railroad pry bar and then put a sling around the fan. According to Alexander, the sling could have slipped. Mechanic Ira Marcel, on the other hand, had never used two by fours or four by fours although he had heard that they had been used. Harold Sheets and Gerald Kliebert had tried conduit, which the fan reduced to spaghetti. The only procedure for stopping this particular piece of equipment was through trial and error.
In this factual situation, in an industrial environment, the majority errs seriously in finding that plaintiff Brown's conduct was unreasonable. Sooner or later, one of the mechanics at duPont would have been hurt fixing this fan. It was Brown's misfortune to be the one who was injured.
The majority implies that one safe method had been devised by Jack Evans to deal with the turning fan. It was established in testimony that there was no specific verbal or written procedure for stopping the rotation. There was urgent need for a better job procedure. The Brown accident report made it clear that the past procedures, *23 which, contrary to the majority, differed in their details, all shared one characteristic. They called for the opposing fan to remain in motion so that production would not be interrupted. Although Richard Ory was convinced that Evans' method was unsafe because of the amount of torque behind the shaft, Evans insisted that the opposing fan not be stopped. Since the company itself found the past procedures unsafe and someone would have been hurt in any event, Buster cannot be deemed contributorily negligent. Many jobs in industry are dangerous. Buster regarded this one as dangerous, but thought it his duty to proceed.
Buster Brown cannot be deemed negligent. He tried to perform his employment function in the same way, using friction to stop the fan, that others had. Justifiably dubious, he still tried to do his duty. The majority errs in finding him unreasonable.
The majority implies that Buster assumed the risk of a known danger. However, Buster "wouldn't have done it if I thought I would get hurt." (Tr. 890)
I respectfully dissent.

ON REHEARING
DIXON, Chief Justice.
Joseph B. "Buster" Brown was a "stepsix shift mechanic"[1] employed by E.L. duPont deNemours & Company, Inc. at its Pontchartrain Works Plant in Laplace, Louisiana when he was injured on August 28, 1975 while working on an industrial fan.
Brown sued twelve executive officers of his employer and The National Drying Machinery Company,[2] the manufacturer of the fan, in tort. The jury returned a verdict in favor of all of the defendants and against Brown. All but one of the executive officers were found to be not negligent.[3] The National Drying Machinery Company was found to be negligent in the construction of the fan: that negligence, however, was found not to be a proximate cause of the accident. Although Jack Evans, Brown's immediate supervisor, was found negligent, the jury also found that Brown was contributorily negligent and had assumed the risk. The Court of Appeal affirmed the judgment of the trial court. Brown v. White, 405 So.2d 555 (La.App.1981). On original hearing this court affirmed the lower courts and specifically found that Brown was contributorily negligent. Brown v. White, 430 So.2d 16 (La.1982).
This court granted a rehearing to reconsider its evaluation of the facts and the applicable law.
Brown had been employed by duPont for eleven years prior to the accident. In 1972 he transferred from the production department to the maintenance department. A "step-six" mechanic, the highest grade mechanic at duPont, he worked as a "shift" mechanic because he lacked seniority. For approximately seven months preceding the accident Brown had been assigned to the Neoprene Finishing Area. That area is a section of the plant where Neoprene film, a type of plastic, goes through a drying process prior to packaging and shipment. The *24 drying process requires the movement of hot air around the film while it moves along a conveyor belt through a large room which has five dryer chambers. The hot air is circulated by ten blowers or fans. These blowers each measure approximately five feet in diameter. There are two blowers to a dryer chamber and these two blowers oppose one another.
On the morning of August 8, 1975 Brown arrived at work at approximately 7:20 a.m. He and the other mechanics met in the lunchroom at 7:30 a.m. with their supervisor, Jack Evans, in order to receive their work assignments for that day. Brown and two other mechanics, Jerry Robertson and Sam Lavigne, were assigned by Evans to work on the number two dryer, number three blower in the Neoprene Finishing Area.[4]
After receiving their assignment the three men went to the locker room to put on their hard hats and their special work shoes. While in the locker room, Sam Lavigne informed Brown that they were to change a defective (cracked) pulley on the number three blower. Lavigne also informed him that he (Lavigne) and Robertson were both scheduled for some medical tests and that they would return as soon as possible. Brown made the necessary preparations for performing the assigned job while Lavigne and Robertson were gone. Brown had no previous experience working on the blowers; both Sam Lavigne and Jerry Robertson had prior experience working on them, since this was their primary area.
Brown first went to production personnel to have the blower or fan they were to work on de-energized and "tagged out" according to the safety procedures.[5] He noticed that the number three blower, although de-energized, was still turning at approximately the same velocity as an energized blower. This windmilling effect was caused by the opposing arrangement of the blowers. When one fan was turned off the current of air from the opposing fan would cause the de-energized fan to rotate in reverse at one-half to three-fourths the normal speed of an energized blower.
Brown then went to the maintenance shop to procure the tools needed for the job. While there he saw two other mechanics (both "step-six" mechanics who worked in the Neoprene Finishing Area as regular mechanics), Larry Boudreaux and Ira Marcel, and asked them what tools he needed for the job. Brown knew that both of these men had a great deal of experience working on these blowers. Brown testified that they told him that he needed a pipe wrench and a wheel puller. He then asked them if he was to stop the fan from turning with these tools. Brown testified that they replied: "Well, that's how everybody does it." Brown remarked that it sounded dangerous. However, Boudreaux and Marcel testified that they only told Brown that he needed a pry bar and a wheel puller and that he needed the pry bar to stop the fan from turning. All three testified that Marcel and Boudreaux did not explain to Brown how to stop the fan from turning with the pipe wrench or the pry bar.
Marcel and Boudreaux then went to their jobs and Brown picked up the tools indicated, a twenty-four inch pipe wrench and a wheel puller, and brought them to the number three blower. Brown went downstairs *25 and waited in the maintenance shop until Lavigne or Robertson returned to begin the job.
Sam Lavigne returned and he and Brown went to work on the blower. Lavigne removed the front safety guard which covered the motor, the two fly wheels and the belts. Brown took the pipe wrench and indicated to Lavigne that he was going to try stopping the fan's rotation by applying friction to the fan belt with the pipe wrench, using part of the angle iron support steel as a fulcrum. Lavigne did not object to this method of stopping the backward rotation of the fan. He had worked on the blowers previously, and had seen ten or twelve other mechanics work on them. Brown attempted to stop the belts two or three times with the wrench, but each time the wrench slipped off of the belts. After these attempts, Lavigne suggested that they throw the wrench into the blower and attempt to jam the rotation of the fan. Brown suggested that they give his method one more try, and again attempted to put pressure on the belt. On this final attempt, the teeth of the pipe wrench got caught on the belt and the wrench, projected upward by the movement of the belt, struck Brown under the chin. This impact threw Brown up into the air and backward, causing severe disfiguring facial and head injuries.
The executive officers Brown included in his suit occupied the following supervisory positions at the time of the accident: Mr. Riser, plant manager; Mr. Lillie, assistant plant manager; Mr. White, production superintendent of the Neoprene area; Mr. Dove, assistant production superintendent of the Neoprene area; Mr. Jones, production supervisor of the Neoprene Finishing Area; Mr. Thompson, plant (production and maintenance) shift supervisor; Mr. Waller, production foreman; Mr. Singer, works engineering superintendent; Mr. Odell, assistant engineering superintendent of maintenance; Mr. Tolle, maintenance supervisor of the Neoprene area; Mr. Evans, maintenance foreman of the Neoprene area; Mr. Frost, safety supervisor.
The issues presented to this court are whether the executive officers are personally liable to Brown for the damages he sustained as a result of his accident; whether The National Drying Machinery Company is liable in tort to Brown for the damages he sustained; and whether Brown was contributorily negligent or assumed the risk of injury, thereby precluding him from recovery for his damages.
Recently, this court in Lytell v. Hushfield, 408 So.2d 1344, 1347 (La.1982), chose to follow the analysis set out in Canter v. Koehring Company, 283 So.2d 716, 721 (La. 1973), for determining the imposition of individual liability for the breach of an employment imposed duty by an executive officer. The analysis is as follows:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty. (Emphasis added).
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the *26 defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm."
The employer, E.L. duPont deNemours & Company, Inc., had the duty to provide its employee, Brown, with a reasonably safe place to work.[6] This duty necessarily includes equipment and machinery which is used in a plant upon which an employee must perform maintenance work. Lytell v. Hushfield, supra at 1348. In this case the employer's duty was delegated to all eleven executive officers. All executive officers had the general responsibility to insure overall plant safety. Evans, however, who was closely associated with the daily problems the mechanics encountered with the equipment and machinery, had the specific responsibility on a daily basis to inform his supervisory personnel of any safety problem made known to him to allow them the opportunity to rectify the situation.
From the evidence presented it appears that Evans was aware of the danger involved in servicing these de-energized, but still rotating, blowers at least as early as June 3, 1974 when the "Ory incident" occurred. Ory was a mechanic assigned to service a de-energized blower who felt that the only safe method to stop the backward rotation of the fan was to turn off the opposing blower. Ory shut down the opposing blower without the participation or permission of the production department and caused a disruption of production for several hours. At this time Ory told Evans that he felt it was unsafe to work on a de-energized, yet still moving, fan and that he thought the only safe way to stop the fan was by shutting down the opposing fan. Evans instructed Ory that he should stop the rotation of the fan with a 2 × 4 or 4 × 4 and a pry bar. Ory told Evans that he felt this method was unsafe. There was an investigation of the "Ory incident." An incident report was prepared and distributed to supervisory personnel, but the report did not contain any safety considerations. Although some of the mechanics knew about the "Ory incident" at the time it occurred, none were made aware that Ory's safety concerns were the reason he had turned off the opposing blower until after Brown's accident.
Evans did not report this safety problem to his supervisors nor did he inform Mr. Frost, the plant safety supervisor, of Ory's safety concerns. There was a procedure by which employees could submit written suggestions concerning safety and other matters when they felt it was necessary. However, the availability of this process for communicating safety problems cannot in any manner exonerate Evans of the duty to inform his supervisors of a dangerous situation when it was made known to him. Evans should have advised the other supervisory personnel of the safety problem when Ory conveyed this reasonable concern to him. The fact that he did not act, once apprised of the danger, was a breach of a duty owed to employees, including Brown. The breach of this duty caused the risk of injury Brown incurred; the dangerous working conditions, recognized by Ory and communicated to Evans, remained unalleviated. Therefore, the trial court did not err in holding Evans negligent.
The other supervisory personnel, listed above, should not be held liable since they breached no duty owed to the employee, *27 Brown. Although Mr. Tolle, Mr. Odell, Mr. Waller, Mr. Lillie and Mr. Riser were aware of the windmilling effect before Brown's accident, because of the "Ory incident," they were not aware of Ory's safety complaints and they did not think that the windmilling was dangerous. Many of the supervisory personnel received a copy of the "Ory incident" report, yet the concern of all involved was that a mechanic, Ory, had done an unauthorized act in shutting down both blowers. No one considered the incident a safety problem, but a problem of a mechanic interfering with production. Therefore, the jury was correct in concluding that none of these executive officers were negligent.
The jury found that The National Drying Machinery Company was negligent in manufacturing the drying system, but that this negligence was not a proximate cause of Brown's injury. This finding was not correct, but the result is the same. The record reveals that duPont submitted to The National Drying Machinery Company the design specifications for the drying system, and that National merely transferred these designs according to its production scale to its own blueprints. A manufacturer cannot be held negligent when it has no part in the design of a system, when it is the system design which presents dangerous risks to the employees, unless the danger is or should be apparent to the manufacturer. C.C. 2315. Therefore, the finding that The National Drying Machinery Company was negligent is reversed.
The jury found that Brown was guilty of contributory negligence and assumption of the risk; the Court of Appeal affirmed. This court on original hearing affirmed the finding of contributory negligence; upon reexamination we reach a different conclusion.
In Martinez v. United States Fidelity and Guaranty, 423 So.2d 1088, 1090 (La.1982), this court set forth the standard for contributory negligence in employee/executive officer suits as follows:
"Emerging as criteria for determining an employee's contributory negligence are:
(1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger."
Jack Evans, the maintenance foreman, had been aware of the windmilling effect and had devised his own method of stopping the de-energized, but still moving, fan by the use of a 2 × 4 against the shaft. Brown had never worked on a blower before, and he was not aware of the windmilling problem until he observed it on the fan he was to service.
Evans did not instruct all of the mechanics as to his method of stopping the fan; instead, he allowed the mechanics to devise their own friction methods of stopping the de-energized moving blowers. It was Evans, not Brown, who could have avoided Brown's accident by informing his supervisors of the danger involved when a mechanic was required to service a fan which was de-energized but still rotating.
Although there was a rule at the plant that an employee was to consult with his supervisor when there was a problem with a job, it was the general practice of the mechanics to consult with one another, or with another mechanic who had done the job previously, to learn how to perform the job. There were no specific safety procedures for working on this blower except the general lock and tag procedure. Obviously this procedure did not cover all situations, since the mere de-energizing of one blower did not make the blower inoperable, as required by the plant safety manual.
Several mechanics assigned to the Neoprene Finishing Area had devised their own method of stopping the windmilling fan, or had asked other mechanics how to stop it and had followed their instructions.
Glen Sellers, a mechanic at the plant, testified that he had stopped the fan to work on it in various ways. He had used a *28 crowbar against the shaft; he had put the heel of his shoe on the pulley and pried against the belts; and he had used a piece of wood or tool to slow the rotation down. He testified that he devised these methods, and he indicated on cross-examination that he would take the front guard off before trying these various methods.
Larry Boudreaux, who had been in the mechanical department for ten years at the time of trial, testified that in order to stop the rotation of the de-energized fan he would take the front guard off and would use a pry bar to apply pressure on the belts, which would reduce the speed of the belts. Ira Marcel, a "step-six" mechanic and a mechanic at duPont for ten years at the time of trial, testified that "there's an understanding of applying friction to the belts to stop it." He testified that he stopped the fan by putting a pry bar or a bar or some long object into the frame and pulling between the two pulleys against the belt until it stopped; he stated that he would remove the front guard in order to reach the fan belts. He also testified that, although he did not use a 4 × 4 or 2 × 4, he had heard that other mechanics had used them to stop the fan.
Jerry Robertson, the mechanic assigned to the job with Brown, testified that he and another mechanic would stop the fan from turning by using a 2 × 4 or 4 × 4 and a pry bar. They then would use a wrench or a chain to keep it from turning while they worked on it. He testified that on one occasion when they attempted to stop the rotation of the blower the 2 × 4 broke.
Sherry "Red" Alexander, a shift mechanic in the Neoprene area at the time of Brown's accident, testified that Evans was aware of the windmilling before Brown's accident. He stated that when he was assigned to work on the blower he had to ask a fellow mechanic how to stop the de-energized fan from rotating. He testified that he used a pry bar and a 4 × 4 piece of oak wood, and that he placed the wood on top of the pry bar and against the shaft to slow down the rotation of the fan. He then secured the shaft with a nylon sling. This sort of method, he testified, was general knowledge among the mechanics.
Warren Debeutt, a "step-six" mechanic, who had been a mechanic at duPont for ten years at the time of trial, testified that Evans showed him how to stop the windmilling of the fan. He testified that Evans told him to use a pry bar or a 2 × 4 against the belts to stop the rotation of the fan. He stated that it was the front guard that he removed when he stopped the fan. He considered the procedures that he had been shown safe until Brown was injured.
Harold Sheets, who had been a "step-six" mechanic for seven years at the time of the trial, testified that he and another mechanic attempted to stop a fan from rotating by throwing a piece of conduit into the fan, and that "it made spaghetti out of it."
These mechanics further testified that there were no specific procedures for working on these blowers and that the only type of training which they received was a few weeks of classes on general mechanical principles and on-the-job training. Further, the incident report on Brown's injury stated: "There was no written job procedure and the verbal job lineup did not include any special instructions regarding this part of the job."
Although Brown considered the method of stopping the rotation of the fan, as indicated to him by Boudreaux and Marcel, dangerous, he testified that he thought it could be performed in a safe manner. Obviously the other mechanics felt they could stop the rotation of the fan in a safe manner, but no one appreciated the danger involved until Brown was injured. The incident report on Brown's accident stated that "some of the other methods reported to have been used in the past are also believed to be unsafe;" the report indicated that the job Brown had begun was completed by locking and tagging the fan on the opposite side of the dryer compartment.
From a review of the total record, it appears that Brown was not contributorily negligent. He merely did the job in a manner similar to the various friction methods in practice at the plant. See Lytell v. *29 Hushfield, supra at 1349; Broadfoot v. Shreveport Cotton Oil Co., 111 La. 467, 469-71, 35 So. 643, 644-45 (1903). Lavigne actually offered to try Brown's method before Brown forged ahead with one more try. Brown cannot be denied recovery merely because he, rather than Lavigne, tried one more time. Brown, considered by his colleagues to be a careful and able mechanic, became convinced that, if others could do it safely, he could do it without injury.
The burden of proving contributory negligence rests with the defendant. C.C.P. 1005; Lytell v. Hushfield, supra at 1348; Dofflemyer v. Gilley, 384 So.2d 435, 439 (La.1980); Prestenbach v. Sentry Insurance Co., 340 So.2d 1331, 1334 (La.1976); McInnis v. Fireman's Fund Insurance Co., 322 So.2d 155, 157-58 (La.1975); Marcotte v. The Travelers Insurance Co., 258 La. 989, 994, 249 So.2d 105, 107 (1971). We find that the defendant failed to prove that Brown did not act like other reasonable men of ordinary prudence under like circumstances. The other mechanics testified that the fan had been stopped in the past by applying friction in one manner or another. All of the methods in use were eventually considered unsafe by duPont.
Therefore, after weighing the relative knowledge of Evans and Brown, Evans' control over the mechanic's situation, the non-appreciation of the danger by anyone except perhaps Ory, Evans' ability to eliminate the danger once apprised of it by Ory, and the lack of reasonable alternatives available to Brown, we conclude that Brown was not guilty of contributory negligence.
The other defense raised is assumption of risk.
The assumption of risk doctrine in Louisiana tort cases is ill defined in many respects; however, this court, in Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971), set forth several general principles which have helped Louisiana courts address the question of employee assumption of risk in executive officer suits. In that case we stated:
"... Usually, the assumption of risk doctrine will apply where the nature of the relationship of the parties appears to exact consent from the one injured to be exposed to possible harm. In such situations the plaintiff understands the risk involved and accepts the risk as well as the inherent possibility of damage because of the risk...." 258 La. at 1086, 249 So.2d at 140.
Furthermore, this court in Langlois decided: "The determination of whether a plaintiff has assumed a risk is made by subjective inquiry, whereas contributory negligence is determined objectively under the reasonable man standard." 258 La. at 1088, 249 So.2d at 141. See Lytell v. Hushfield, supra at 1348-49; Chaney v. Brupbacher, 242 So.2d 627 (La.App.1970).
In the present case, Evans, Brown's immediate supervisor, knew of the potential danger of working on the de-energized, yet still rotating, blower. Nevertheless, he did not warn his mechanics of the risks. Despite his knowledge he assigned Brown to service a blower which Brown had never worked on before. Brown undertook to perform the job as suggested by the other mechanics. The alternative, as viewed by the defendants, was for Brown to report his reservations to his supervisor. In not choosing this alternative, it cannot be said that Brown consented to the exposure of harm he encountered. See Langlois v. Allied Chemical Corp., supra; Lytell v. Hushfield, supra; Chaney v. Brupbacher, supra.
Brown felt that the job was dangerous and expressed his reservations to his fellow mechanic, Lavigne. However, he felt that he could perform the job safely without injury; he testified that he would not have attempted the job if he had thought that he was going to get hurt. Brown testified: "... if I go report every job to Mr. Evans and say I am not going to do the job because I think it's dangerous, I don't believe I would have stayed there too long." This fear of losing a job because one is a complainer is a realistic fear of an employee who is assigned daily to perform tasks *30 which necessarily involve a degree of danger because of the nature of the job.[7]
In the present case, due to the unequal employment positions of Evans and Brown, Brown could not have willingly consented to encountering the possibility of danger. He lacked the requisite freedom of choice necessary for the assumption of a known and appreciated risk. It would not have helped for Brown to point out the danger to Evans, because Evans already knew about it, and had done nothing to remedy the danger. Nor could the inexperienced Brown have instructed Evans how to perform the job. See Chaney v. Brupbacher, supra at 632. Therefore, Brown could not have realistically refused to work under this dangerous condition.
Furthermore, many of the mechanics testified that they seldom consulted management when they had a problem with a job; rather they would consult other experienced mechanics to find out the proper way to approach the work. This practice is what Brown had learned. Reliance upon this accepted practice cannot be viewed as a voluntary and deliberate choice to encounter a known risk which would exonerate Evans from his liability. See Lytell v. Hushfield, supra at 1349; Broadfoot v. Shreveport Cotton Oil Co., 111 La. at 469-71, 35 So. at 644-45.
Factually and legally, the defendants failed to prove that Brown assumed the risk. Based upon the testimony of Brown and the testimony of Mr. Scardino, a safety engineer, it is evident that Brown had no other reasonable choice except to do the job in the usual way.
For the foregoing reasons, we hold that Jack Evans was negligent, the other ten executive officers were not negligent, and that The National Drying Machinery Company was not negligent. Furthermore, Brown was not contributorily negligent and did not assume the risk of injury incurred.
The judgment as to Jack Evans is reversed and the case is remanded to the Court of Appeal for the determination of damages and any other appropriate proceedings not inconsistent with this opinion; the judgments as to the ten other executive officers[8] and the judgments as to The National *31 Drying Machinery Company and its insurer, Pennsylvania Manufacturers' Association Insurance Company, are affirmed; all costs are to be divided equally between plaintiff, Joseph B. Brown, and defendant, Jack Evans.
WATSON, J., concurs in the opinion except as to the exculpation of National Drying Machinery Company and its insurer, dissenting as to them.
CALOGERO, J., dissents for reasons expressed in majority opinion on original hearing.
BLANCHE, J., dissents for reasons assigned by Calogero, J. on original hearing.
NOTES
[1] The Neoprene Finishing area is a section of the plant where Neoprene film, a type of plastic substance, is subjected to a drying process. That process requires movement of air around the Neoprene film while it moves through a large room on a conveyor belt. The air is circulated by ten fans, each measuring approximately five feet in diameter, which operate in pairs.
[2] There were five pairs of fans in the area. The electrically driven fans were housed within the interior of the Neoprene Finishing System. The fan blade assembly and its shaft were turned by a fan belt which was attached to the wheel on the end of the shaft and to the motor. The fan belt section of the equipment was accessible, for mechanical repairs, by the removal of the back safety guard. In addition, the fan shaft was accessible by the removal of a side plate, without exposing the belt, wheels and motor.
[3] Safety procedures in effect required that equipment not be worked on unless and until it was de-energized and rendered inoperable. A part of the de-energizing procedure was for the mechanic and someone from the production department to find the appropriate electric switch and turn it off. The switch was then tagged with the mechanic's name and locked with the mechanic's lock. This would prevent the equipment's being accidentally turned on while the mechanical work was in progress. Plaintiff de-energized the No. 2 blower, then tagged and locked the electric switch.
[4] The arrangement of the fans, in facing pairs, was such that if one fan in a pair was turned off, the air being moved by the other paired fan would cause the de-energized fan to rotate backwards, a sort of "windmill effect".
[5] Boudreaux and Marcel testified that they did not explain to plaintiff how to stop the fan from turning, but only told him to use a pry bar. However, Jack Evans had devised a method by which one took off the side panel and pressed the pry bar against the fan shaft, using the bottom metal side of the equipment as a fulcrum. This method did not require the removal of the safety guard covering the fan belt.
[6] The jury was charged on this point as follows:

Should you conclude that the employee was using the product in an improper manner and that this was the sole proximate cause of his injury, rather than any manufacturing defect being the total proximate cause of his injury, then the plaintiff would not be entitled to recover from the manufacturer.
[7] Plaintiff's proposed charge No. 3 was as follows, with the part not given by the trial judge in brackets:

The negligence aspect of this case involves a comparison of duties. In considering negligence and contributory negligence in a given situation, the jury should not necessarily demand identical conduct of the plaintiff and the defendants, and varying factors affect what conduct the standard of a reasonable man requires. [In the present case you are entitled to exact a higher degree of care from the supervisory employees who had the responsibility for the safety of the subordinate employees and the responsibility of furnishing the subordinate employees with safe and adequate equipment to perform expected tasks.]
[8] Defendant's proposed charge No. 14 provided:

A workman cannot be supervised at every moment. His responsibility to exercise reasonable care for his own safety and protection is at least equal to that of his supervisory co-employees.
[9] Plaintiff testified that he was told to use a pipe wrench by his co-workers. Yet, the co-workers, Boudreaux and Marcel, testified that they told plaintiff to use a pry bar, not a pipe wrench.
[1] A mechanic gradually worked himself up to a step-six mechanic, the highest grade mechanic, by the passage of time, and by taking additional classes and tests for each step increment. "Shift" mechanics rotated from area to area, depending upon need. Regular mechanics were assigned to an area which was considered their "primary" area.
[2] The lower courts referred to The National Drying Machinery Company as National Drying Machinery, Inc. and this court on original hearing referred to the company as National Machinery Drying, Inc. The pleadings filed by the company use the name The National Drying Machinery Company, instead of the names utilized previously by the courts. In accord with the manner in which the company refers to itself, we will throughout this opinion call it The National Drying Machinery Company.
[3] The trial court granted a judgment according to the jury's verdict in favor of eleven of the executive officers. These executive officers were Manning W. Riser, James H. Lillie, Douglas White, William Dove, Bill M. Thompson, Bernard Waller, Merritt I. Singer, Albert Odell, Michael Tolle, Jack Evans and William P. Frost. During trial the plaintiff voluntarily dismissed Kent W. Jones without prejudice, reserving all of his rights against the other defendants.
[4] The blowers were electrically driven and were housed within the interior of the Neoprene Finishing System on the second floor of the plant. The fan blade assembly and its shaft were turned by a fan belt which was attached to a pulley wheel on the end of the shaft connected to the motor. Each blower was completely surrounded by guards.
[5] Safety procedures in effect at the time of Brown's accident prohibited working on equipment unless and until the machine was rendered inoperable. De-energizing the machinery was considered rendering the machine inoperable. The de-energizing procedure required the mechanic working upon the machinery and a person from the production department to locate and turn off the appropriate electric switch. The switch was then tagged by the production operator and the mechanic and locked with the mechanic's lock. This procedure was designed to prevent the accidental turning on of the machinery while the mechanical work was being performed.
[6] R.S. 23:13 provides:

"Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations."
[7] Mr. A.J. Scardino, a safety engineer, testified as follows:

"Q I believe the last question I asked was the one about the manufacturer. Would you, as a safety engineer from your experience in industry, expect a working man to run to his foreman every time that he encountered some difficulty doing a job?
A He couldn't do that too many times.
Q And in setting up a safety program, do you anticipate that workmen do, in fact, follow the orders of their supervisory personnel in doing a particular job?
A Most certainly, yes.
Q Why is that?
A Well, in any type of activity, particularly, in industry, we have certain degrees of hazards. The very nature of industry is hazardous. However, we have learned to work safely in these hazardous conditions and employees have learned to rely on their supervision even though the tasks they have to perform might be hazardous that they would not be sent into an unsafe condition.
Q And in setting up a safety program and job procedures, do you anticipate that that is in fact what will occur? That relationship between employee and employer or supervisor and the people under him?
A By necessity, you have to have it. Otherwise, you have chaos.
Q And as a safety engineer, do you expect that workmen will perform jobs that have been performed in the past by others in their capacity in a similar fashion?
A Most certainly, yes.
. . . . .
Q From your experience as a safety engineer, would you expect a workman or mechanic to do jobs that are at sometimes dangerous if he is ordered to do a particular job by his supervisor?
A Surely.
. . . . .
Q Why is that so?
A Well, when an employee is instructed to do something by his supervisor, he is expected to carry out that responsibility. That is what he is hired for and being paid to do.
Q Is that not the reason why in fact in certain dangerous jobs such as working on moving equipment that in the Pontchartrain Works manual and other safety manuals require specific job procedures on dangerous jobs such as working on moving equipment?
A That is correct."
[8] The ten other executive officers are Manning W. Riser, James H. Lillie, Douglas White, William Dove, Bill M. Thompson, Bernard Waller, Merritt I. Singer, Albert Odell, Michael Tolle and William P. Frost.