11 McKAY, Judge.
Lorraine Collins was brought to the emergency room at University Hospital (formerly Hotel Dieu) at approximately 1:30 p.m. on April 3, 1993 by her daughter and son-in-law. Mrs. Collins had symptoms of fever, an elevated white blood count, and a disoriented mental state.[1] Mrs. Collins was given a preliminary examination and tests were performed. Mrs. Collins was placed on oxygen because she reported herself short of breath, preliminary tests indicated dramatically low blood oxygen levels, and x-rays indicated some pulmonary difficulties. Her white blood count was 11,400.[2] Mrs. Collins also had no health insurance.
After Mrs. Collins had been at the University Hospital emergency room for approximately five hours, Dr. Martin Belled, the treating emergency room physician, informed Mrs. Collins and her family that *170 Mrs. Collins would be transferred to Charity Hospital where more extensive tests would be performed. 12Pr. Belled further informed them that Dr. Amy Ernst would meet them at the Charity emergency room.
Mrs. Collins along with her records was sent to Charity by ambulance. Oxygen equipment from University Hospital was employed during the transfer. However, upon her arrival at Charity, the ambulance crew took the oxygen equipment back with them. Dr. Ernst was nowhere to be found in the busy Charity emergency room, where Mrs. Collins’ husband Daniel met them. The family members tried to give Mrs. Collins’ records to various emergency room personnel but were told that she would have to wait. One doctor took a brief look at Mrs. Collins. He classified her condition as “urgent” but not “emergent.”
At approximately 11:45 p.m., she was taken in the back for a thorough examination. Her white blood count was 12,300 and she was placed back on oxygen. She was admitted to Charity at 7:00 a.m. on the morning of April 4. At the time of her admission, her white blood count was 16,-900. Then for the first time antibiotics were administered to her.
Mrs. Collins remained in the hospital for another thirty-three days. For much of this time she was comatose. During this time she developed a fungal infection and a streptococcal infection. She gradually weakened and died on May 7,1993.
Daniel Collins and his adult children filed a complaint with the Division of Administration alleging acts of medical malpractice, as well as violations of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395 dd. UThe medical review panel found that the delay in starting antibiotics was unreasonable and below the standard of care. The panel did not address the EMTALA issue.
A jury trial was conducted from September 8, 1999 through September 23, 1999. On September 23, 1999, the jury rendered a verdict for the plaintiffs on all issues and awarded them $938,000.00 in damages. The trial court reduced the award to $500,000.00 to comply with the damages cap fixed by the Medical Malpractice Act. La. R.S. 40:1299.39 et seq. The defendants filed motions for a new trial, judgment notwithstanding the verdict, and remitti-tur. All of these motions were denied. Thereupon, the defendants appealed. The plaintiffs answered the appeal asserting that the judgment should be increased to $938,000.00. The defendants/appellants also have an exception of prescription before this Court.
ASSIGNMENTS OF ERROR
On appeal, the defendants/appellants raise nine assignments of error, while the plaintiffs/appellees raise one. The defendants/appellants contend that: 1) the trial court erred in denying the exceptions of no cause of action regarding the EMTALA violations sought by the plaintiffs/appellees in this matter, which allowed this issue to proceed to trial and allowed plaintiffs an additional cause of action for which the federal jurisprudence regarding EMTALA has consistently denied; 2) the trial court erred in denying the motion in limine brought by defendants/appellants in this matter regarding the testimony of the ^plaintiffs’ infectious disease expert, Dr. Michael Bergman; 3) the trial court erred in allowing the video tape of the deceased Daniel Collins to be played for the jury when the defendants/appellants had no opportunity to cross examine him; 4) the trial court erred in allowing the admission of the deposition of Dr. William Mogabgab, by relying on the hearsay statement of another physician who was not brought to court to demonstrate that Dr. Mogabgab was an unavailable witness as defined by the Louisiana Code of Civil Procedure; 5) the trial court erred in failing to provide appropriate remedial instructions to the jury after the plaintiffs/appellees failed to remove all demonstrative exhibits from the courtroom, prior to the jury using said *171 courtroom during its deliberations; 6) the trial court erred in allowing plaintiffs/ap-pellees to introduce an entirely new cause of action not related to the original petition, when said cause of action was prescribed, and said cause of action was not presented to a medical review panel as required by La. R.S. 40;1299.1, and which deprives the trial court of the subject matter jurisdiction to hear said new claim; 7) the trial court erred in allowing the jury to consider the loss of a chance of survival claim when no evidence was presented to the jury that Lorraine Collins suffered a less than even chance of survival as a result of the alleged acts of malpractice committed by defendants/appellants, and that such an award was duplicative given that the jury was allowed to also award both wrongful death and survival action damages; 8) the amount awarded by the jury was clearly in excess of the established jurisprudence of this state for said causes of action, and therefore represents a clear abuse of discretion of the jury process, requiring | ¡^reformation and a re-mittitur by the trial court; and 9) the jury’s verdict is incorrect in light of the great weight of the evidence properly presented before the trial court and should therefore be set aside. The plaintiffs/appellants contend that the judgment should be increased to $938,000.00.
EMTALA
The Emergency Medical Treatment And Labor Act, § 42 U.S.C. 1395 dd, was enacted by Congress with the specific intent and goal of preventing hospitals from dumping patients from private hospitals to publicly funded facilities because of the financial status of the patients presenting themselves to these emergency rooms. Therefore EMTALA has become known as the ‘Anti-Dumping’ statute. Evidence of an impermissible financial motive is not required in an EMTALA action. However, a plaintiff is required to demonstrate that the treatment received was different from that received by those that ordinarily visit or patronize the facility in question. “Accordingly, EMTALA appropriate medical screening examination is not judged by its proficiency in accurately diagnosing the patient’s illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms.” Marshall v. East Carroll Parish, 134 F.3d 319, 322 (5th Cir.1998).
In the instant case, the plaintiffs/appel-lees introduced no evidence during trial that Lorraine Collins was treated any differently at University Hospital than any other patient who presented requiring either an admit for observation, or further diagnostic testing such as a CT scan. Furthermore, in Boudreaux v. State, 97-0076 (La.App. 4 Cir. 1/15/97) 687 So.2d 596, 597, our Court held that in an EMTALA claim against the Charity Hospital system it is “nonsensical to argue that the Hospital made the medical decision in this case based on indigence since Charity Hospital is, by definition, organized to provide medical services to the indigent and is not advantaged by practicing ‘dumping’.”
While it may be argued that EM-TALA creates a federal malpractice action, the federal jurisprudence clearly establishes that EMTALA was enacted in response to the concern that hospitals were dumping medically indigent patients either by refusing to provide emergency medical treatment or by transferring indigent patients without having stabilized their emergency conditions. The Act was not designed to provide a federal remedy for misdiagnosis or general malpractice. Brooks v. Maryland General Hospital, 996 F.2d 708 (4th Cir.1993).
In the instant case, the trial court allowed the jury to award damages for violation of EMTALA despite the fact that no evidence of any damages were presented to the jury. Such an award is clearly redundant in light of the fact that the appellees were allowed to proceed forward with a cause of action for both the wrongful death and survival action of Lorraine Collins. Accordingly, the trial court *172 erred in allowing the jury to consider the issue of an EMTALA violation.
THE TESTIMONY OF DR. BERGMAN
The defendants argue that Dr. Bergman’s testimony was insufficiently “scientific” to pass the test of Louisiana Code of Evidence article 702 and Daubert, and he should not have been allowed to testify in this case. See Daubert v. Merrell Dow, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Dr. Michael Bergman is board-certified in internal medicine and infectious disease. He has published articles in professional journals. He is also on the faculty of the University of Massachusetts Medical School. The defendants, in fact, offered to stipulate to Dr. Bergman’s qualification as an expert in infectious disease.
The only portion of Dr. Bergman’s testimony which is controversial is his stated willingness to use the antibiotic vancomy-cin in the emergency room prior to receipt of a positive blood culture. This use is consistent with the Center for Disease Control’s (CDC) 1993 guidelines for use of vancomycin but arguably contrary to the CDC’s 1994 guidelines.[3] In any event, Dr. Bergman’s testimony is completely consistent with the plaintiffs’ other expert witnesses and concurs with the defendants’ expert witnesses on many points.
The trial judge has wide discretion in deciding which expert testimony to admit and his judgment will not be disturbed unless clearly erroneous. Mistich v. Volkswagen, 95-0939 (La.1/29/96) 666 So.2d 1073. Accordingly, the trial judge did not abuse his discretion as a gatekeeper by allowing Dr. Bergman to testify. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
^VIDEOTAPE OF DANIEL COLLINS
Prior to trial, Daniel Collins became terminally ill. Before his death, his son-in-law, Arnold Bourgeois, who works as a cameraman for a local television station, made a short video tape of about three minutes in length that shows Mr. Collins reminiscing about his late wife. The tape makes no mention of the events that transpired at the University and Charity emergency rooms. Neither plaintiffs’ counsel, nor defense counsel had pri- or knowledge that Mr. Bourgeois was going to make this tape. The trial court reasoned that the tape was “innocuous” and allowed it to be introduced into evidence. Mr. Collins had also been properly deposed prior to his death.
The defendants' contend the trial court erred in allowing the videotape to be introduced, arguing that the video was, in effect a perpetuation deposition taken contrary to the rules of procedure, while the plaintiffs contend the video was more analogous to family photographs. In its charge to the jury, the trial court instructed the jury on the difference between Daniel Collins’ deposition testimony, taken under oath and subject to cross-examination, and the video. The trial court instructed the jury that the video was not to be viewed as the equivalent of a deposition. It appears to this Court that the trial court took adequate precautions instructing the jury regarding the weight to be given the video. Accordingly, the trial court did not abuse its discretion in admitting the video.
IciDR. MOGABGAB’S DEPOSITION
The defendants contend that the trial court, based on the hearsay statement of another physician who was not brought to court to demonstrate that Dr. Mogabgab was an unavailable witness as envisioned by the Louisiana Code of Civil Procedure, erred when it allowed the admission of the *173 deposition of Dr. William Mogabgab. However, after a careful review of the record, the only objections we find regarding Dr. Mogabgab have to do with his qualifications as an expert witness and introduction of his curriculum vitae. Accordingly, this assignment of error is without merit.
EXHIBITS LEFT IN THE COURTROOM
During his testimony, Dr. Bergman drew a diagram on a chalkboard to illustrate the difference between gram-positive and gram-negative bacteria. Plaintiffs’ counsel referred to the diagram during his closing argument and placed the chalkboard where the jury could view the diagram. When the exhibits were removed from the courtroom, where the jury deliberated, the chalkboard with the diagram on it was left behind.
The defendants contend that the trial court erred in failing to provide remedial instructions regarding the exhibits left in the courtroom during jury deliberations. However, our review of the record indicates that defense counsel never requested a limiting instruction; defense counsel moved for a mistrial, which the trial court denied. Because the defendants never sought a limiting instruction, the trial court did not err by not issuing such an order.
| ^PRESCRIPTION AND AMENDMENT
The trial court allowed the plaintiffs to amend their pleadings to include a claim that Mrs. Collins’ death was caused by the fungal and streptococcal infections Mrs. Collins developed at Charity Hospital. The defendants argue that this amendment should not be deemed to relate back because the fungal and streptococcal infections were separate and distinct from the staphylococcal infection that the medical review panel concluded was not properly treated because of the defendants’ negligence. The defendants further allege that the claim that Mrs. Collins’ death was causally related to the fungal and streptococcal infections was not presented to the medical review panel in this case. These arguments however are incorrect.
A party making an administrative claim of malpractice against a state health care provider is required to satisfy the requirements of federal notice pleading. Administrative claims against state health care providers are required to comply with Rule 8 of the Federal Rules of Civil Procedure. La. R.S. 40:1299.39 E(2). A claimant is not required to set out in detail the facts upon which he bases his claim. All that is required is a “short and plain statement of the claim” in order to give the defendant fair notice of the plaintiffs claim and the grounds upon which it is made. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Unlike petitions for damages in state court, medical malpractice administrative claims require only that the state be put on notice of what is being claimed. Specific facts need not be plead.
Inin the instant case, the state was put on notice that the plaintiffs were alleging that Mrs. Collins’ death was caused by the hospital acquired fungal and streptococcal infections. In their administrative claim, the plaintiffs allege that Mrs. Collins developed candida septicemia from an infected intravenous catheter and that there was an untimely delay in the removal of the infected device. This allegation put the state on notice that the plaintiffs were complaining about streptococcal infections as well as the state health care providers’ failure to appropriately treat Mrs. Collins’ staphylococcal infection. Furthermore, the Louisiana Supreme Court has held that the duty of an original tortfeasor not to injure a victim may include the risk that subsequent injury would result from treatment by medical professionals of the original injury. Weber v. Charity Hospital, 475 So.2d 1047 (La.1985); Younger v. Marshall Industries, Inc., 618 So.2d 866 (La.1993). Accordingly, the trial court did not err in submitting to the jury the issue of failure to meet the standard of care of *174 physicians practicing in the field of infectious disease. Also neither has this issue prescribed.
APPELLANTS’ ASSIGNMENTS OF ERROR VII & VIII and APPELLEES’ ASSIGNMENT OF ERROR I
The appellants argue that, on the evidence presented, the trial court erred in permitting the jury to make an award for loss of chance of survival because the award for loss of survival is duplicitous of the other elements of damage. The appellants also contend that the jury’s award was excessive. Both of these assignments of error are inconsequential. When the trial court reduced the jury’s award to $500,000, these issues became moot. Accordingly, we will look at them |12no further. Likewise, we find that appellees’ assignment of error one is also without merit. The medical malpractice act clearly provides that damage awards against qualified health care providers are to be capped at $500,000.
WEIGHT OF THE EVIDENCE
The appellants contend that the jury’s verdict is incorrect in light of the great weight of the evidence properly presented before the trial court and therefore should be set aside. This contention however is wrong. As stated above we find no error as to the trial court’s decision to admit certain evidence. Furthermore, “[w]here there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong... .[Ajppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.... [Where] a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). Accordingly, in the instant case the jury was not manifestly erroneous or clearly wrong in accepting the plaintiffs’ evidence over that of the defendants’.
CONCLUSION
For the foregoing reasons, we affirm the trial court’s judgment in all respects with the exception of its allowing the issue of an EMTALA violation to go before the jury, which we reverse. However, considering that the trial court capped thej^appellees’ award at $500,000.00, reversal on this issue has no practical effect as to these parties. Appellants’ exception of prescription is also hereby denied.
AFFIRMED IN PART AND REVERSED IN PART.

. It was later agreed that this was the onset of sepsis.

. A person's white blood count is a measure of infection. A normal white blood count is between 8,000 to 10,000.

. The CDC’s 1994 guidelines are more restrictive than the 1993 guidelines, having been tightened in response to increased concern about development of bacterial strains resistant to vancomycin. Dr. Bergman’s willingness to use vancomycin in the emergency room prior to receipt of blood culture results is consistent with the CDCT993 guidelines. Mrs. Collins was treated in the emergency room in April of 1993.