851 So.2d 1152 (2003)
Darrell SCOTT and Bonnie McFarland
v.
DAUTERIVE HOSPITAL CORPORATION, et al.
No. 02-1364.
Court of Appeal of Louisiana, Third Circuit.
April 23, 2003.
Rehearing Denied June 18, 2003.
*1155 Harry Douglas Hoskins, III, Hoskins & Hoskins, LC, New Orleans, LA, for Plaintiff/Appellant Darrell Scott.
Marc W. Judice, Judice, Hill & Adley, Lafayette, LA, for Defendant/Appellee, Louisiana Insurance Guaranty Association.
Stephen Gary McGoffin, Durio, McGoffin, Stagg & Ackermann, Lafayette, LA, for Defendant/Appellee, St. Paul Fire & Marine Insurance Company, Dauterive Hospital Corporation.
Court composed of JIMMIE C. PETERS, MARC T. AMY, and ELIZABETH A. PICKETT, Judges.
AMY, Judge.
The plaintiff filed suit against the defendant hospital, alleging that inadequate care in its emergency room resulted in physical injury. He pursued various negligence theories of recovery and sought damages under the Emergency Medical Treatment and Active Labor Act (EMTALA) as well. The jury denied the plaintiff's claims of EMTALA violations, gross negligence, inadequate credentialing, and inadequate training and supervision of employees, but found the hospital breached the standard of care owed to the plaintiff. However, the jury concluded that this breach did not cause damage to the plaintiff. The plaintiff appeals. For the following reasons, we affirm.

Factual and Procedural Background
The plaintiff, Darrell Scott, received injuries as the result of a bar fight on February 27, 1994. The record indicates that injury possibly resulted from a bottle being broken over his head. At the time of the incident, Mr. Scott was accompanied by his girlfriend, Bonnie McFarland. When Ms. McFarland found Mr. Scott lying on the ground outside of the bar in New Iberia, she telephoned for an ambulance. Acadian Ambulance Service received the telephone call, arriving at the scene at 1:36 a.m. Paramedic Keith Pellerin testified that he found Mr. Scott lying on the ground, but his eyes were open. He explained that Mr. Scott was awake, "but very lethargic." He noted a "small one and a half inch laceration to the left temporal lobe." Mr. Pellerin found the plaintiff's pupils to be round, equal, and reactive to light. He found the smell of alcohol on the plaintiff's breath to be "very strong." Mr. Pellerin testified that he indicated on his report that the patient's condition at the scene was "non-emergent," a term he described as meaning "non life threatening." The plaintiff was transported to Dauterive Hospital in New Iberia.
On arriving at the hospital, Mr. Scott was attended by Nurse Mona Moore[1] and *1156 Dr. Agapito Castro, a physician with Coastal Emergency Medical Services of Louisiana. By contract, Coastal provided emergency physician services to Dauterive. Nurse Moore noted on the emergency room report that Mr. Scott was "awake, alert, skin warm, dry to touch." She explained that she would have noted if she had found the patient to be lethargic. There is no indication of lethargy on the emergency room record. Furthermore, there is no inscription on the record indicating Dr. Castro's finding as to whether Mr. Scott was awake, alert, or oriented. He stated that "in this particular case the nurse said that the patient was awake, alert, and I took her word for that." Dr. Castro ordered x-rays of Mr. Scott, which, according to the x-ray technician performing the tests, were not completed due to Mr. Scott's inability to keep his mouth open for the completion of one of the tests.[2] The technician testified that he noted the patient to be "highly intoxicated." Dr. Castro testified that, if he was informed of the inability to complete the x-rays series, he could not recall it. Dr. Castro sutured Mr. Scott's laceration and released him.
According to Ms. McFarland, her brother and the nurse assisted Mr. Scott to the car for transport home. Mr. Scott was released with a set of instructions. Ms. McFarland stated that after she and Mr. Scott were returned to their camper, she attempted to wake Mr. Scott every hour or two, according to the release instructions. She contends that, eventually, she telephoned the ambulance when Mr. Scott became incontinent and began vomiting. Mr. Scott was transported to University Medical Center in Lafayette and then to Charity Hospital in New Orleans. At Charity, he underwent brain surgery, resulting in the removal of two hematomas from his right frontal and right temporal lobes. The parties do not dispute that the surgery has impacted Mr. Scott's life, resulting in behavioral and cognitive imbalances.
The instant matter was initially filed in April 1995.[3] Dr. Castro, Coastal, Dauterive and its insurer, St. Paul Fire and Marine Insurance Company, were named as defendants in the various supplemental and amending petitions that have been filed since that time. The matter has a lengthy history, with numerous supplemental and amending petitions and the addition of parties and various theories of recovery. The plaintiff's basic contention is that his symptoms were such that a CT scan should have been ordered to eliminate the possibility of injury to the brain while he was at Dauterive. He also asserts that, had a blood alcohol test been performed, it would have eliminated drunkenness as a cause of what he contends was his lethargic condition at the hospital. He argues this was not done due, in part, to his uninsured status. He argues that had the CT scan been performed at the hospital, the surgery required due to the hematomas could have been performed more quickly. He asserts that the resulting damage to his brain was increased by the delay.
Pursuant to a February 2001 settlement, Dr. Castro, Coastal, the Louisiana Patient's Compensation Fund (PCF), and the Louisiana Insurance Guaranty Association, were released from the suit. The plaintiff continued this matter against the instant defendants, Dauterive and St. Paul. At trial, the plaintiff argued that Dauterive breached the standard of care owed in a *1157 number of respects, failed to adequately credential Dr. Castro for the emergency room, and failed to properly train and supervise its employees. He argued that the conduct in the emergency room was not only negligent, but grossly negligent. The plaintiff also asserted that the hospital failed to provide an adequate screening as required by EMTALA. The jury denied the plaintiff's claims, although it found that Dauterive breached the standard of care owed. However, it concluded that this breach was not the cause of damages to the plaintiff.
The plaintiff appeals, asserting various interrelated assignments of error and issues for review. With regard to pretrial proceedings, the plaintiff contests a partial summary judgment entered as to Dauterive's status as a qualified health care provider. He also questions the jury charges provided, contending that they were inadequate in several respects. He contends the inadequate instructions caused jury error and require a de novo review. The plaintiff also contests a motion in limine that was granted, which excluded evidence of future medical damages which he argued were available under EMTALA and theories of recovery not arising under the Medical Malpractice Act. Next, the plaintiff contests several of the findings of the jury, contending that their findings required the granting of a new trial. Finally, the plaintiff argues that the trial court erred in excluding evidence as to taxes that would be due from the plaintiff in the event he received a lump sum award for lost earning capacity.

Discussion

Qualified Health Care Provider Status
Prior to trial, the parties filed cross motions for summary judgment on the issue of whether Dauterive is a qualified health care provider, which subjects the plaintiff to the "cap" of the Medical Malpractice Act. The trial court granted the motion filed by Dauterive, concluding that the hospital was a qualified health care provider. The plaintiff's motion was denied. The plaintiff asserts that this determination was in error, arguing that the St. Paul policy issued to the hospital is not a malpractice liability insurance policy at all, but is a "fronting" policy that constitutes a surety agreement. He contends that it does not meet the requirements of La.R.S. 40:1299.42(E)(1) and, therefore, Dauterive cannot avail itself of the cap of the Medical Malpractice Act.[4]
*1158 In support of his motion for summary judgment on this issue, the plaintiff points to deposition testimony of a St. Paul representative, Jane Lienemann. She testified that the premium paid by HealthTrust, Inc., Dauterive's parent company, for the policy issued by St. Paul, was not reflective of exposure to liability, but rather, was what she described as a fronting premium, reflective of costs associated with issuing and servicing the policy. She also testified regarding an Indemnification Agreement dated September 1993, in which Health-Trust agreed to indemnify St. Paul for liabilities under the policy. HealthTrust also agreed to establish a trust containing assets in order to cover the liabilities.
The plaintiff further contends that wording in other areas of the medical malpractice provisions indicate that the type of policy issued by St. Paul is not that required for application of the cap described above. Specifically, the plaintiff points to La.R.S. 40:1299.44(A)(3)(a) regarding payment of a surcharge by the health care provider to the Patient Compensation Fund as follows: "Such surcharge shall be due and payable to the patient's compensation fund within forty-five days after the premiums for malpractice liability insurance have been received by the agent of the insurer, risk manager, or surplus line agent from the health care provider in Louisiana." (Emphasis added.) Additionally, La.R.S. 40:1299.45(A)(1) provides that "[o]nly while malpractice liability insurance remains in force, or in the case of a self-insured health care provider, only while the security required by regulations of the board remains undiminished, are the health care provider and his insurer liable to a patient, or his representative, for malpractice to the extent and in the manner specified in this Part." The plaintiff contends that the use of "premium" and "malpractice liability insurance" indicates that a "fronting" policy as described by Ms. Lienemann is insufficient to qualify under the statute.
The plaintiff correctly states that the limiting provisions of the Medical Malpractice Act are to be strictly construed as they are in derogation of the rights of tort victims. See Spradlin v. Acadia-St. Landry Med. Found., 98-1977 (La.2/29/00); 758 So.2d 116. However, we do not conclude that the trial court was incorrect in granting the partial summary judgment in favor of the defendants. The documents submitted on the motions for partial summary judgment indicate that the policy issued by St. Paul to HealthTrust, Inc. is malpractice liability insurance within the *1159 terms of the statute. A Certificate of Enrollment is contained in the record whereby the PCF acknowledges that at both the time of the treatment at Dauterive Hospital and the commencement of the action, St. Paul provided a "claims made" policy for the hospital.[5] The affidavit of the Malpractice Insurance Director for the Patient's Compensation Fund Oversight Board is attached, whereby she confirms the existence of professional liability coverage during this time period.[6] Reference to the text of the St. Paul policy reveals that it contains the assurances commonly found in a liability policy. The addition of the indemnity agreement and the type of contractual provision entered into between HealthTrust, Inc. and St. Paul do not detract from St. Paul's obligation to service the policy. It requires performance to a claimant just as it would if the "fronting" provisions contained in the indemnity agreement were not attached. Ms. Lienemann's testimony confirmed this in her deposition, wherein she responded to defense counsel's questioning as follows:
Q. Exhibits 2 and 3 which are the policy and then that one endorsement for Louisiana, was it St. Paul's intention to issue a policy of insurance on behalf of HealthTrust?
A. Yes, it was.
Q. Was it St. Paul's intention that third persons such as Mr. Darrell Scott would look to that policy to define the insurance coverage being provided to a particular named insured or endorsed insured?
A. Yes.
Q. And St. Paul had a mechanism set up by which it could obtain reimbursements in any amount that it paid to those third persons; correct?
A. That is correct.
Q. In fact, that this was referred to in your industry as a fronting policy does not change the character of this in terms of it being an insurance policy, does it?
A. No, it does not.
Finding that the policy is sufficient under the statute, we find no error in the trial court's determination to grant the motion for partial summary judgment in favor of Dauterive, concluding that the hospital was a qualified health care provider.

Jury Charges
The plaintiff contests the jury instructions provided by the trial court, asserting *1160 that they resulted in an incorrect verdict. He argues an incorrect verdict resulted because several charges he requested were not included in the trial court's instructions. He also asserts that an incorrect and misleading instruction was provided as to causation. Due to these alleged errors, he contends that the trial court should have granted a new trial and, on appeal, this court should invalidate the jury's finding and perform a de novo review.
In consideration of this argument, we are mindful of the standard of review for jury instructions. In Nicholas v. Allstate Ins. Co., 99-2522, p. 8-9 (La.8/31/00); 765 So.2d 1017, 1023, the Louisiana Supreme Court explained:
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Melancon v. Sunshine Const., Inc., 97-1167 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011. The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. United States v. L'Hoste, 609 F.2d 796, 805 (5 Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Smith v. Travelers Ins. Co., 430 So.2d 55 (La.1983). In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if they adequately provide the correct principles of law as applied to the issued [sic] framed in the pleadings and evidence and whether they adequately guided the jury in its deliberation. Kaplan v. Missouri-Pacific R.R. Co., 409 So.2d 298, 304-05 (La.App. 3 Cir. 1981). Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Brown v. White, 405 So.2d 555, 560 (La.App. 4 Cir.1981), aff'd, 430 So.2d 16 (La.1982).
First, the plaintiff asserts that the jury's determination that EMTALA was not violated was due in part to the trial court's failure to include a jury charge he requested, which indicated that a hospital is liable for a doctor's violation of EMTALA.[7] The trial court instructed the jury as to EMTALA as follows:
Let me say that we have a statute here you've heard called EMTALA. It reads in part "... for the examination and treatment for emergency medical conditions." The medical screening requirement in the case of a hospital that has a hospital emergency department, if any individual comes to the emergency department and a request is made for the individual'son the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency room to determine whether or not an emergency medical condition exits [sic].
Any individual who suffers personal harm as a direct result of a participating *1161 hospital's violation of a requirement of this section in a civil action, the participating hospital obtained those damages available to personal injury under the laws of the state in which the hospital is located, and such equitable relief as is appropriate.
An emergency conditions [sic] means the following: a medical condition manifesting itself by acute symptoms of sufficient severity such, and that includes severe pain, such that the absence of immediate attention could reasonably be expected to result in one, placing the health of the individual in serious jeopardy; two, serious impairment to bodily function; or three, serious dysfunction of any bodily organ or party.
A participating hospital may not delay provisions of an appropriate medical screening examination required under Sub-section A of this section or further medical examination and treatment requirement under Sub-section B of this section, in order to inquire about the individual[']s method of payment or insurance status.
A violation of a statute, code, ordinance, or government regulation, may not be negligence where the action which violated the statute was not unreasonable under all the circumstances, or was not a legal cause of the action.
Reference to EMTALA, provided at 42 U.S.C. § 1395dd, indicates that the above instructions are essentially a verbatim rendering of the statute. Furthermore, when the jury inquired as to EMTALA requirements, the trial court delivered a redacted version of the statute for the jury's review and did so with consent of counsel.
Although the plaintiff preferred a specific instruction regarding the hospital's liability under the statute for Dr. Castro's fault, we do not conclude that the trial court was required to provide such specific instruction. Rather, the trial court instructed the jury by providing the text of the statute, which broadly requires that the hospital "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department...." 42 U.S.C. § 1395dd(a). While no particular directive was provided regarding the hospital's responsibility for any failure of Dr. Castro, the jury was free to find in this regard as the trial court did not provide any instruction which would have precluded such a finding. Our review of the instruction reveals no erroneous instruction.
Similarly, the plaintiff contends that the trial court was required to provide specific instructions regarding the apparent authority doctrine or control. In his brief to this court, the plaintiff states that "[t]here were no signs in the hospital emergency room ... stating that it did not employ the doctors, who worked there." He also points out that Dr. Castro testified that patients likely believed that he was an employee of the hospital and that the hospital billboards advised passersby to "Trust the Doctors you Know." These factors, the plaintiff contends, require instruction as to apparent authority and control.
In reviewing this portion of the jury charge, we observe that the jury was not provided with instruction regarding employee/independent contractor status. Neither was the jury informed of the settlement with Dr. Castro and Coastal. The jury was simply informed that Dr. Castro was not a defendant. Evidence was presented as to the fault, or lack thereof, of all actors. Additionally, defendants presented evidence regarding Dr. Castro's employment with Coastal and his performance as an emergency room physician at Dauterive. The defendants also presented expert testimony regarding hospital administration and the independent contractor *1162 status of emergency room doctors in general.
While there was no instruction given as to apparent authority and control, or independent contractor/employee classification, the jury was instructed: "You must bear in mind that a corporation can only act through officers, employees or agents. An employer is liable for the negligent acts of its employees while they are acting in the course and scope of their employment." Additionally, the jury was instructed that: "A hospital is also responsible for the negligence of its employees under the doctrine of respondeat superior." Simply put, the case proceeded as an independent contractor matter with little evidence on the question of whether Dr. Castro was an employee of the hospital. In the event the jury found Dauterive liable, the verdict sheet required apportionment of fault between Dauterive and Dr. Castro. Given the weight of the evidence presented to the jury, we find no error in the refusal to instruct as to apparent authority or control or that any such error would have probably contributed to the verdict, requiring that it be set aside.
Next, the plaintiff objects to the trial court's instruction on causation. The trial court instructed the jury as follows:
With respect to the issues in this case, the burden of proof rests upon the party who asserts the affirmative of an issue. For example: should the plaintiff assert that the defendant is negligent, the plaintiff has the burden of proving this. On the other hand, should the defendant assert that the plaintiff's injuries are caused by plaintiff's own negligence or the plaintiff's negligence was a contributing cause of the accident, then the defendant bears the burden of that proof.
Now, there are some presumptions that are applied by law. If you find that the plaintiff was in good health before the accident but after the accident or the event in this case, the plaintiff had an injury and there is a reasonable possibility that the accident caused the injury, then the law presumes that the accident caused the injury.
....
A required element of plaintiff's case under any theory of law is that plaintiff's damages be caused by the defendant. A defendant is the legal cause of plaintiff's damages if: the conduct of the defendant is a cause-in-fact of those damages, and secondly, if the damages are within the scope of risk created by the defendant's duty.
To be a cause-in-fact, the conduct of the defendant must be a substantial factor in causing damage. You will first consider what, if any, conduct of the defendant falls below the standard which the law imposes upon him, or it; you must ask whether plaintiff would have suffered damages "but for" this conduct. If plaintiff probably would have suffered injuries regardless of the defendant's conduct, then you must conclude that the injuries were not caused-in-fact by the defendant. If, on the other hand, plaintiff would not have suffered in the absence of defendant's conduct, then you must conclude that defendant did not play a part in plaintiff's injury.
If you find that the defendant's conduct was the cause of plaintiff's injuries, you must determine whether that injury was within the scope of the risks encompassed by defendant's duty. Put another way, you must determine whether the duty which defendant breached was designed to prevent the type of harm that actually occurred. If you find the duty was designed to protect plaintiff from some other harm, or that the duty was designed to protect some other potential victim, then you must find that plaintiff's *1163 injuries were not within the scope of the risk of defendant's duty, and you must find that defendant was not the legal cause of plaintiff's injuries.
In Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1400 (La.3/23/01); 782 So.2d 606, the Louisiana Supreme Court explained that the cause-in-fact element of the duty/risk analysis usually involves a "but for" inquiry. In the event of concurrent causes of an accident, however, the supreme court has found the appropriate inquiry to be whether the conduct complained of was a "substantial factor" in bringing about the accident. Id.
As can be seen above, the trial court instructed the jury as to causation with statements regarding both the "substantial factor" and the "but for" inquiries. The plaintiff contends that inclusion of the "but for" information caused confusion. While the trial court is required to correctly advise the jury of the correct legal principles, it is not required to use the specific wording preferred by the parties. Gourley v. Prudential Property Ins., 98-0934 (La.App. 1 Cir. 5/14/99); 734 So.2d 940, writ denied, 99-1777 (La.10/8/99); 750 So.2d 969. As can be seen above, the jury was advised of the substantial factor test and we do not find that the inclusion of the "but for" information "misled the jury to the extent that it was prevented from dispensing justice." Nicholas, 99-2522, p. 8; 765 So.2d at 1023.
Neither do we find error in the instructions insofar as they did not include the plaintiff's requested charge on the "single indivisible injury rule."[8] The trial court instructed the jury as to fault as follows:
The law requires that you divide responsibility by assigning percentages of fault. If you are convinced by the evidence that the damages were caused solely by one party's substandard conduct or responsibility, you can return a verdict, and I'm going to give that form to one of you, by assigning 100% to the responsible party. You may assign varying percentages to various parties in this case too, but they must total 100%. In making these determinations, you should consider both the nature of the conduct of each party at fault, if at fault, and the extent of the causal relation between conduct and the damages claimed.
Given the plaintiff's continued urging that the plaintiff's injury was caused in two parts, i.e., the initial fight produced the injury to the brain, but the delay in diagnosis/treatment caused aggravation of the damage, we find no error in the trial court's above instruction regarding apportionment of fault.
Having considered the jury instructions, we find no merit in the plaintiff's arguments.

Motion in Limine
At the time of trial, the defendants filed a Motion in Limine to Exclude Evidence of Future Medical Expenses. This motion referenced the plaintiff's settlement with Dr. Castro, Coastal, Coastal's insurer, and the PCF, among others. Included in that settlement was a recognition that the plaintiff's claim for future medicals was compromised, settled, and resolved. As PCF's responsibility for the future medicals has been acknowledged, and satisfied *1164 by the settlement, the defendants argued, there should be no evidence of the future medicals permitted at trial. The trial court agreed, finding that the claim for future medicals had been satisfied and that the plaintiff's attempt to recover future medical expenses under EMTALA or under claims not covered by the Medical Malpractice Act would permit double recovery. The defendants point to the Louisiana Supreme Court's opinion in Gagnard v. Baldridge, 612 So.2d 732 (La.1993), for its discussion regarding the prohibition against requiring a tortfeasor to pay twice for the same elements of damages. The Supreme Court noted that this type of double recovery is in the nature of a punitive damage, which must be provided for by legislation.
The plaintiff questions the determination, pointing out that, although the PCF was released in the settlement, all rights were reserved to proceed against Dauterive and its insurer. He contends that the satisfaction of the future medical expenses under the Medical Malpractice Act does not bar his recovery for future medical expenses under EMTALA or torts not arising under the Medical Malpractice Act.
In review of a ruling on a motion in limine, we are mindful that a trial court has great discretion in its consideration of the motion. See Furlough v. Union Pacific R.R. Co., 33,658 (La.App. 2 Cir. 8/31/00); 766 So.2d 751, writ denied, 00-2929 (La.1/12/01); 781 So.2d 556. See e.g., Heller v. Nobel Ins. Group, 00-0261 (La.2/2/00); 753 So.2d 841. The transcript of the hearing indicates that, with regard to the extent of the settlement for future medical expenses, the plaintiff argued:
[W]hat we've settled is ... if it's the PCF's liability for future medical if the Medical Malpractice Act applies. We did not settle the claims for EMTALA for future medical, and we did not settle the malpractice claims which may not be covered by the Medical Malpractice Act. So, I would say that if there's anything that they may be entitled to, it would be a credit and not as a total release.
The trial court disagreed, finding that the release of PCF for future medical expenses released their recovery under alternative theories of EMTALA and claims not arising under the Medical Malpractice Act. The trial court referenced Gagnard, 612 So.2d 732, stating that it found the case prohibitive of "double recovery for the same item of damage." The trial court concluded that with regard to the settlement, "we've settled away future medicals, the future element." Accordingly, the motion in limine was granted, with specific evidence of future medical expenses excluded.
The plaintiff appeals this ruling, asserting again that future medical expenses should be recoverable under EMTALA and claims not arising under the Medical Malpractice Act. On this ground, we find no abuse of discretion in the trial court's granting of the motion in limine due to the supreme court's prohibition of double recovery in Gagnard. What is unclear from the record is whether consideration was given to Dauterive's exposure to $100,000 in damages in the event it was found liable for malpractice arising under the Medical Malpractice Act. See La.R.S. 40:1299.42(B)(2). While the settlement released PCF for future medicals, rights were reserved against Dauterive. In any event, the plaintiff did not pursue arguments in this regard, possibly due to the fact that if liability was imposed under the Medical Malpractice Act, evidence was presented as to general damages and lost wages which could have exceeded the $100,000 statutory limit. See La.R.S. 40:1299.42(B)(2). Furthermore, even if the trial court abused its discretion due to this possibility, any such error would not now require correction due to the jury's findings *1165 on the merits, and our affirmation of those determinations.

Liability
The plaintiff also contests the jury's denial of the EMTALA, credentialing, and gross negligence claims.[9] Due to these alleged errors, the plaintiff asserts that the trial court erred in denying his motion for new trial. He contends that, on appeal, it is appropriate for this court to vacate the jury verdict, perform a de novo review of the record, and enter judgment in his favor.
In our review of the factual findings of the jury, we observe that a factfinder's verdict may only be reversed if the record does not contain a reasonable factual basis for the verdict and, based on the record, it is concluded that the verdict is manifestly erroneous. Dept. of Transp. v. Schwegmann Expressway, 95-1261 (La.3/1/96); 669 So.2d 1172.

EMTALA
With regard to the EMTALA claim, the plaintiff contends simply that Dauterive failed to provide a proper screening as is required by the statute. He contends that, in particular, the failure to provide the CT scan, when the circumstances indicated it was required, was inadequate screening. This decision, he argues in his brief, was "an economic decision, not a medical decision." (Footnote omitted.)
In Spradlin, 98-1977; 758 So.2d 116, the Louisiana Supreme Court reviewed the creation of EMTALA noting that it was enacted in 1986, due to concern that hospitals were "dumping" uninsured patients or those with the inability to pay by refusing to provide services to persons with emergency situations or by transferring those patients to another hospital before the emergency condition was stabilized. The supreme court observed that through the statute, 42 U.S.C. § 1395dd, Congress "narrowly defined the conduct required of hospitals when an individual requests examination or treatment at the emergency department." Id. at p. 8; 121. The statute establishes two types of "dumping" claims: "(1) failure to conduct an appropriate medical screening examination to determine the existence of an emergency medical condition, and (2) failure to stabilize the emergency condition or to provide an appropriate transfer." Id. at p. 9; 121. It is the first type of claim the plaintiff pursued in this matter.[10]
*1166 The supreme court observed that EMTALA has created a cause of action that is to be considered "separate and distinct from, and not duplicative of, state malpractice causes of action." Spradlin, 98-1977, p. 9; 758 So.2d at 121. Although the claims are distinct, a malpractice claim and a dumping claim may, at times, overlap. Id. See also Coleman v. Deno, 01-1517, 01-1519, 01-1521 (La.1/25/02); 813 So.2d 303. Insofar as the screening claim is concerned, a plaintiff must demonstrate that the treatment rendered at the hospital differed from the treatment received by those who typically are cared for at the facility. Collins v. State ex rel. Louisiana Health Care Authority, 99-2307, 99-2308 (La.App. 4 Cir. 7/12/00); 774 So.2d 167, writ denied, 00-2633 (La.11/17/00); 775 So.2d 439. Furthermore, the required "`appropriate medical screening examination is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms.'" Id. at p. 5; 171 (quoting Marshall v. East Carroll Parish, 134 F.3d 319, 322 (5th Cir.1998)).
Our review of the evidence presented by the plaintiff reveals no evidence requiring a finding that Dauterive failed to provide an adequate screening. While, in the end, more extensive testing and observation may have proved beneficial, the jury was aware that the plaintiff presented at the hospital, smelling of alcohol after having been in a bar fight. The degree of lethargy while at the hospital, of importance in deciding whether a CT scan is appropriate, was in dispute at trial. The jury was not required to find that the plaintiff was anything other "alert" or "awake" as noted on the hospital record. In its role as a factfinder, testimony to the contrary could have been discounted. In sum, the jury was not required to accept that the plaintiff's observable condition was of such a degree as to require the CT scan. While at the hospital, he was attended to by both a nurse and a physician and his laceration was sutured. He was delivered for x-rays, which the hospital attempted to perform. The failure to perform the CT scan may have arguably been malpractice, as could have been the failure to complete the entire series of x-rays, but there is no indication that the failure to do so under the circumstances is necessarily an EMTALA violation. While medical judgment may have been found to dictate a higher level of care, there is no indication that the plaintiff was treated differently than any other patient who presented at the hospital with similar symptoms.[11] In fact, the jury was aware of the testimony of Kay Colby, Chief Nursing Officer at Dauterive and the hospital's former Director of Quality and Risk Management, who denied the existence of any policy to refuse any service to any patient in its emergency room once it is ordered by a doctor. In sum, even in the presence of evidence of negligent care (recall the defendant also asserted malpractice) no evidence presented was so compelling as to prevent the jury from rejecting the plaintiff's argument that the hospital rendered an insufficient screening under standards of EMTALA, 42 U.S.C. § 1395dd.

Credentialing
The plaintiff also argued that Dauterive was negligent in failing to properly credential Dr. Castro as an emergency room physician. The evidence indicated that Dr. Castro, a Board Certified Family Practitioner, was credentialed by the hospital for family practice, not emergency *1167 room medicine. In support of his contention that this failure to credential Dr. Castro in emergency room medicine was negligent, the plaintiff offered the testimony of Dr. Richard Bucci, accepted by the trial court as an expert in emergency medicine. Dr. Bucci stated that in 1994, it was the practice to credential physicians in emergency medicine. He also explained that, although not every physician who works in an emergency room is Board Certified in emergency medicine, one would expect the physician to have some training in emergency medicine. Due to this testimony, the plaintiff contends, the jury erred in failing to find that Dr. Castro was properly credentialed.
As in any negligence case, the burden is on the plaintiff to establish the standard of care. See Thomas v. Southwest Louisiana Hosp. Ass'n, 02-0645 (La.App. 3 Cir. 12/11/02); 833 So.2d 548. The jury was not required to accept that the plaintiff's evidence established that standard of care. In Natchitoches Parish Port Com'n v. Deblieux & Kelley, Inc., 99-313, 99-314, 99-315, p. 18 (La.App. 3 Cir. 3/22/00); 760 So.2d 393, 404, writ denied, 00-1121 (La.6/2/00); 763 So.2d 601, a panel of this court explained that "expert witness testimony is not conclusive and ... the opinions expressed by experts are generally regarded as advisory in nature. As such, they are not binding on the trier of fact."
The jury was free to conclude that Dr. Bucci's testimony as to the standard for staffing emergency rooms did not reflect the standard applicable to Dauterive in 1994.[12] Accordingly, we find no error in the determination that the plaintiff failed to prove that Dauterive improperly credentialed Dr. Castro.

Gross Negligence
The plaintiff argued that Dauterive was liable for what he considers to be the gross negligence of Dr. Castro. His argument in his brief to this court in this regard is as follows: "The conduct of Dr. Castro clearly was grossly negligent. Dr. Castro was told at least twice by Bonnie [that] Darrell's condition was not due to his being drunk, but he callously ignored her. Ignoring what is obvious is gross negligence." In Ambrose v. New Orleans Police Amb. Serv., 93-3099, 93-3110, 93-3112, p. 5-6 (La.7/5/94); 639 So.2d 216, 219-20 (citations omitted), the Louisiana Supreme Court explained as follows with regard to "gross negligence," stating:
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Gross negligence, therefore, has a well-defined legal meaning distinctly separate, *1168 and different, from ordinary negligence.
Our review of the record reveals no evidence requiring the jury to have concluded that the plaintiff was the victim of gross negligence at the hospital. In fact, the state of the evidence did not even require the jury to find negligence on the part of Dauterive, let alone gross negligence.
In sum, we find the above conclusions of the jury to be supported by the record. The associated factual and credibility determinations are best left to the trier of fact. Finding no manifest error, we do not reverse the findings as the plaintiff asserts that we should. Similarly, and due to this finding, we also find no merit in the plaintiff's assertion that the trial court erred in failing to grant a new trial. Neither Article 1972 nor Article 1973 of the Louisiana Code of Civil Procedure required the trial court to grant the plaintiff's motion for new trial.

Exclusion of Evidence Regarding Tax Burden
In his final assignment of error, the plaintiff contends that the trial court erred in excluding evidence of what he contended would be an increased tax burden in the event he was awarded a lump sum award for lost earning capacity. As the resolution of the issues above renders this issue moot, we do not address it.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assigned to the plaintiff, Darrell Scott.
AFFIRMED.
PETERS, J., concurs in the result.

JUDGMENT ON MOTION TO RECUSE
The appellant, Darrell Scott, has filed a motion to recuse the panel assigned to hear his appeal and requests that the court hear his motion en banc. The panel he seeks to recuse rendered an opinion affirming the trial court judgment rejecting his claims for damages. The basis of the appellant's motion to recuse is that, because the panel rendered its opinion rejecting his claims, no member of the panel should consider his motion for rehearing.
As stated in Rapides Parish Police Jury v. Grant Parish Police Jury, 01-2293 (La.11/16/01), 801 So.2d 1069, "[a] hearing on a motion to recuse is required only if the moving party sets forth a valid ground." In the matter now before us, the appellant has set forth no valid reason why this panel should be recused other than the fact that the panel ruled against him in his appeal. Therefore, we reject his motion to recuse the instant panel, and do so without a hearing. Id.
AMY, J., dissents and assigns written reasons.

DISSENT ON MOTION TO RECUSE
AMY, J., dissenting.
I agree with the majority that the motion to recuse lacks merit. However, I dissent for procedural reasons. I conclude that the motion to recuse is controlled by La.Code Civ.P. art. 160, which relates to the recusation of court of appeal judges. Article 160 provides, in part:
When a written motion is filed to recuse a judge of a court of appeal, he may recuse himself or the motion shall be heard by the other judges on the panel to which the cause is assigned, or by all judges of the court, except the judge sought to be recused, sitting en banc.
*1169 In this case, the plaintiff, by written motion, attempts to recuse the entire panel as to the application for rehearing. In my opinion, the above article provides for and limits an appellate panel to two options when presented with such a motion to recuse. First, the panel may, if appropriate, grant the motion to recuse. Alternatively, the panel must refer the motion to the remainder of the judges of the court, sitting en banc, for consideration. As I have reviewed the motion and find it meritless, I do not find self-recusal appropriate. Therefore, I conclude that the only remaining option is for consideration of the motion to recuse by the remainder of the court, sitting en banc. Accordingly, I respectfully dissent from the majority's denial of the motion to recuse as I would refer the recusal motion to the remainder of the court for en banc consideration under article 160.
NOTES
[1] Ms. Moore testified that at the time of her examination of the plaintiff, she was a licensed practical nurse.
[2] The record indicates that one of the x-rays requires the patient to open his mouth so that the top vertebrae can be seen.
[3] Although Bonnie McFarland was originally a plaintiff, pursuant to an April 1997 consent judgment, her claims were dismissed with prejudice.
[4] La.R.S. 40:1299.42, entitled "Limitation of Recovery," provides the "cap" of the Medical Malpractice Act, which the plaintiff argues is inapplicable. It also contains the qualification requirements. The statute provides, in part:

A. To be qualified under the provisions of this Part, a health care provider shall:
(1) Cause to be filed with the board proof of financial responsibility as provided by Subsection E of this Section.
(2) Pay the surcharge assessed by this Part on all health care providers according to R.S. 40:1299.44.
(3) For self-insureds, qualification shall be effective upon acceptance of proof of financial responsibility by and payment of the surcharge to the board. Qualification shall be effective for all others at the time the malpractice insurer accepts payment of the surcharge.
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient's compensation fund pursuant to the provisions of R.S. 40:1299.44(C).
(b) The total amounts paid in accordance with Paragraphs (2) and (3) of this Subsection shall not exceed the limitation as provided in Paragraph (1) of this Subsection.
....
E. (1) Financial responsibility of a health care provider under this Section may be established only by filing with the board proof that the health care provider is insured by a policy of malpractice liability insurance in the amount of at least one hundred thousand dollars per claim with qualification under this Section taking effect and following the same form as the policy of malpractice liability insurance of the health care provider, or in the event the health care provider is self-insured, proof of financial responsibility by depositing with the board one hundred twenty-five thousand dollars in money or represented by irrevocable letters of credit, federally insured certificates of deposit, bonds, securities, cash values of insurance, or any other security approved by the board. In the event any portion of said amount is seized pursuant to the judicial process, the self-insured health care provider shall have five days to deposit with the board the amounts so seized. The health care provider's failure to timely post said amounts with the board shall terminate his enrollment in the Patient's Compensation Fund.
[5] The certificate further states that "It is further certified that professional liability coverage for ONE HUNDRED THOUSAND $100,000.00 Dollars through the above named insurance company, acknowledges primary responsibility for the indicated period(s)."
[6] The affidavit contains the Director's statement that Dauterive Hospital was a qualified healthcare provider during the periods listed on the certificate as the hospital "submitted the requisite proof of primary professional liability insurance coverage, and having paid the requisite surcharge for excess coverage by the Patient's Compensation Fund." She further stated:

(3) According to the records on file with the Patients' Compensation Fund, DAUTERIVE HOSPITAL also purchased additional coverage affording professional liability insurance for occurrences prior to September 1, 1995 and paid an additional surcharge to the Louisiana Patients' Compensation Fund to preserve DAUTERIVE HOSPITAL's status as a "qualified health care provider" for occurrences at DAUTERIVE HOSPITAL prior to September 1, 1995.
(4) By virtue of said coverage and the surcharges paid on behalf of DAUTERIVE HOSPITAL, pursuant to La.R.S. 40:1299.42, DAUTERIVE HOSPITAL was a qualified healthcare provider under the Louisiana Medical Malpractice Act [La.R.S. 40:1299.41 et seq.] with regard to all occurrences at that facility prior to September 1, 1995.
[7] The plaintiff's requested "Charge No. 45", which was not given, states: "a physician [who treats patients in fulfillment of their contractual duties with the hospital] is also a violation by the hospital. [sic]" The plaintiff draws this requested verdict from Burditt v. Dep't of Health and Human Services, 934 F.2d 1362 (5th Cir.1991).
[8] The plaintiff requested the jury instructions include the following:

[Where] ... "two or more persons acting independently are guilty of consecutive acts of negligence closely related in point of time, and cause damage to another under circumstances where the damage is indivisible, i.e., it is not reasonably possible to make a division of the damage caused by the separate acts of negligence, and negligent actors are jointly and severally liable."
[9] Although the plaintiff does not specifically argue that the jury's finding as to the lack of causation was manifestly erroneous, he repeatedly references causation throughout the brief, asserting that this court, in a de novo review, should find causation. Although we do not perform a de novo review and this issue has not been specifically preserved for review, we do observe that, while the jury found a breach of the standard of care, the jury was not required to find causation of the plaintiff's injuries. Although the plaintiff's central claim of negligence against the hospital was inadequate nursing care, the plaintiff's manner of presentation was to point to all conduct as insufficient in some way. The jury could have very well accepted that some action or inaction breached the standard of care, but that a deficiency in one of these areas was not responsible for the defendant's release without more thorough testing.
[10] With regard to this claim, 42 U.S.C. § 1395dd provides:

(a) Medical screening requirement
In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
[11] The plaintiff presented the records of another patient admitted at the hospital who received more detailed care. However, the other patient arrived at the hospital with congestive heart failure, manifesting different symptoms than those of the plaintiff.
[12] Furthermore, the defendant presented the testimony of Theodore Badger, Jr., accepted as an expert in Hospital Administration, who at the time of trial was employed as the Chief Executive Officer of Beauregard Memorial Hospital in DeRidder, Louisiana. Mr. Badger testified regarding the general credentialing process and explained that his understanding of the credentialing process at Dauterive, as explained by Kay Colby, was consistent with his experience with credentialing. He also denied that the emergency room physicians at his hospital were all Board Certified in emergency medicine.