854 So.2d 386 (2003)
GULF OUTLET MARINA, INC.
v.
Joseph SPAIN.
No. 2002-CA-1589.
Court of Appeal of Louisiana, Fourth Circuit.
June 25, 2003.
Writ Denied November 7, 2003.
*387 Tracy Ann Petruccelli, Law Offices of Mary Beoubay Petruccelli, Chalmette, LA, for Plaintiff/Appellee.
Mary Ann Hand, Salvador E. Gutierrez, Jr., Gutierrez and Hand, Chalmette, LA, for Defendant/Appellee.
Allain F. Hardin, Fransen & Hardin, A.P.L.C., New Orleans, LA, and Chester C. Stetfelt, Jr., Metairie, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge CHARLES R. JONES, and Judge TERRI F. LOVE).
Chief Judge WILLIAM H. BYRNES III.
Joseph Spain, defendant/plaintiff in reconvention/third party plaintiff/appellant, as the owner of the vessel, Lady of Spain, appeals a November 13, 2001 judgment rendered, pursuant to a judge trial, against him in favor of the plaintiff/defendant in reconvention/appellee, Gulf Outlet Marina ("Marina"), awarding the Marina $908.00 for past due rent for a boat slip and $1,500.00 for expenses incurred by the Marina for the preservation of the Lady of Spain and all costs. In the same judgment, Joseph Spain's reconventional demands against the Marina as well as his third party demands against the Marina's owner, Robert Berthelot, and Jack Stephens in his official capacity as the Sheriff of St. Bernard Parish ("Sheriff") were dismissed. The trial court issued no written reasons.
On June 24, 1989, the plaintiff/defendant in reconvention/appellee, Gulf Outlet Marina ("Marina"), filed suit against Joseph Spain, defendant/plaintiff in reconvention/third party plaintiff/appellant, as the owner of the vessel, Lady of Spain, for nonpayment of $908.00 of rent allegedly from August 1988 through July of 1989 for a boat slip in the Marina. The rent was due pursuant to a written lease entered into on October 8, 1986 at the rate of $145.00 per month, plus $10.00 per day for late payments made after the tenth of the month.
Based on an affidavit signed by a Marina employee, Alvin Dodd, an ex parte order of sequestration was issued on July 24, 1989, without bond. The Sheriff's office seized the vessel at the Halter Marine shipyard on the same day.
On August 28, 1989, the Marina filed a supplemental and amending petition, amending the rental claim upward to $1,643.00, covering the period from August *388 1988 through August 1989. However, in paragraph "IV.A" of the supplemental and amended petition, the Marina qualified the nonpayment allegation with the following language:
[Spain] has failed to pay petitioner for the months of August 1988 through and including August 1989 more specifically the rent for February 1989 through August 1989 is past due and owing. [Emphasis added.]
In a series of pleadings, Joseph Spain filed various answers, reconventional demands and third party demands, contesting the allegations of nonpayment of rent and seeking damages to his vessel for the negligence and/or intentional acts of the Marina, Berthelot and the Sheriff. Spain's claim for damages arises out of the fact that his seized vessel sank during the course of the sequestration and remained submerged for an extended period of time.
On October 19, 1990, the writ of sequestration was dissolved based on a rule filed by Joseph Spain alleging that the delinquency was actually only $141.00 and that the vessel was worth close to $100,000.00. An order was signed on October 24, 1990, allowing Joseph Spain to enter Marina's premises to reclaim the vessel.

I. DID THE TRIAL COURT FAIL TO COMPLY WITH LA. C.C. ART. 1636 CONCERNING PROFFERED EVIDENCE?
The most serious assignment of error asserted by Spain is that the trial court refused to allow him to make a proffer of certain evidence and testimony that it excluded from evidence. La. C.C.P. art. 1636(A) provides:
When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence. [Emphasis added.]
The effect of LSA-C.C.P. art. 1636 was explained in Anderson v. Casualty Reciprocal Exchange, 602 So.2d 282, 284 (La. App. 2 Cir.1992):
According to LSA-C.C.P. Art. 1636, "when a court rules against the admissibility of any evidence, it shall[[1]] either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.".... LSA C.C.P. Art. 1636 is mandatory, not discretionary.[[2]] Hopkins v. Department of Highways, 350 So.2d 1271 (La.App. 3d Cir.1977), on remand 364 So.2d 616, writ denied 365 So.2d 262; Liberty Mutual Ins. Co. v. Bryant, 191 So.2d 747 (La.App. 2d Cir. 1966), writ denied 250 La. 16, 193 So.2d 528. However, the trial judge has the discretion [[3]] to receive the proffer in full, or to require a statement setting forth the nature of the evidence.[[4]] LSA-C.C.P. Art. 1636. Neither form of a proffer was allowed in this case.
Id.
This court agrees with Anderson that the opportunity to proffer excluded evidence is mandatory under La. C.C.P. art. 1636, but the trial court has the discretion to receive the proffer in full, or to require a statement setting forth the nature of the evidence.
Martin v. Esponge, 388 So.2d 128, 130 (La.App. 1 Cir.1980), is consistent with the *389 Anderson court's conclusion that limiting the proffer to a statement of the nature of the excluded evidence rather than the reception of the evidence in full is sufficient under La. C.C.P. art. 1636:
The appellant is not prejudiced by a trial judge's limiting his proffer to a statement setting forth the nature of the evidence rather than allowing him to make a complete record thereof, since the appellate court will remand for completion of the record if, in the former case, the evidence excluded is ruled admissible. [Emphasis added.]
Id
This Court agrees with both Anderson and Martin that a statement setting forth the nature of the excluded evidence is sufficient and within the discretion of the trial court.
Additionally, the appellees argue that if the trial court's rulings on evidence and testimony sought to be proffered by Spain were error, they were harmless errors because the excluded proffers related to the issue of damages, and that issue is relevant only if the court found the Marina, and/or Berthelot and/or the Sheriff liable to Spain, which it did not.
The attempted proffer concerned evidence of value of Spain's vessel to be offered by Sewell Williams, of the Sewell Williams Marine Survey Company, who was qualified by the court without objection as an expert in marine survey. Mr. Williams attempted to testify concerning a "retrospective appraisal" of the vessel. It is important to the disposition of this issue to consider carefully what testimony Mr. Williams was allowed to give and what was excluded:
Q. .... Did you have the opportunity to determine a valuation of that vessel?
A. I was asked by Mr. Spain to do a retrospective appraisal of the vessel. At the time I looked at the vessel, it was blocked at a shipyard on the Chef Highway between the bridges, Chef bridge and the rigolets bridge. I don't recall the name of the yard.
Q. Did you also look at photographs of the vessel prior to its sinking?
A. I looked at photographs Mr. Spain had furnished me from his photo album, and he told me this was the boat as to when he was living on it.
Q. Based upon your examination of the vessel, based upon the photographs, based upon your knowledge in the area of marine surveying, as far as the value of that vessel, what did you determine it to be prior to that vessel
MR. GUTIERREZ:
I object, Your Honor. I think, the proper foundation is not being laid. I think, Mr. Williams, in all due respect, did a retrospective survey in 1993 of a vessel on the Chef Pass which he is now surveying retrospectively as to what this vessel's condition and value was in July of 1989, some four years earlier based on what he looked at in his report of his survey of 1976. I think, it's totally improper. [Emphasis added.]
THE COURT:
I have to agree. I sustain the objection. You know, I think, Mr. Williams believes and agrees that on a retrospect four years after the fact cannot assist either this Court or anyone else in making a determination. Had he seen it a month after or a week afterwards, the Court may be inclined to listen. If he had seen it a year before, the Court may be inclined to listen. Some four years later, you know[Emphasis added.]

*390 MR. GUTIERREZ:
Additionally, Your Honor, my objection is also he based it on pictures. In all due respect to Mr. Williams, he doesn't even know when these pictures were taken. He doesn't know if the pictures were touched up. There is no foundation on the pictures. I think, it's all speculation.
THE COURT:
I think, that would put Mr. Williams in a very precarious situation, you know. I am going to sustain the objection.
MR. HARDIN:
Your Honor, at this time, I would like to ask Mr. Williams some questions whether or not he as a marine surveyor feels comfortable with doing what he did in this case in order to determine valuation.
THE COURT:
Is he going to ask the Court whether I feel comfortable in accepting it?
MR. HARDIN:
Your Honor, what I would like to do, then, if that's the case, is to proffer his testimony to at least create the record. I submit that in this kind of case, given what you were dealing with, it's next to impossible to come up with a marine surveyor who would have seen the vessel right at the time that it was drafted in the water. This is actually the best evidence given a burden of more probable than not in terms of valuations. This is, I suggest, the appropriate method by which to approach it.
THE COURT:
Counsel?
MR. GUTIERREZ:
Your Honor, I mean, he is attempting to proffer evidence. It's still, to me inadmissible evidence when a person is doing a survey of a vessel four years later for a condition four years earlier based on pictures. Also, if you read his report, it says, "In response to your request for our opinion of what the fair market value of subject vessel in caption could have been in the summer of 1989, we have concluded that the LADY OF SPAIN should have enjoyed a fair market value of approximately $20,000. [Emphasis added.] We base our retrospective appraisal on studying our 1976 survey report[Emphasis added.]
MS. TRACY PETRUCELLI:
Seventeen years earlier.
MR. GUTIERREZ:
It's much earlier. He is basing it four years after what he is telling it at based on something that he saw a survey that was
THE COURT:
Seventeen years before, I understand.
MR. GUTIERREZ:
I don't blame Mr. Williams for it. I just think it's totally improper.
THE COURT:
The Court agrees, you know. I think, you put Mr. Williams in a very precarious position that callsand I know that most of his job is opinion. However, this goes beyond pure opinion. Even to his own language indicates the hypothet that he has to draw upon to even get to there. So, I am going to sustain the objection. [Emphasis added.]
MS. TRACY PETRUCELLI:
Additionally, Your Honor, the sequestration was lifted, according to the judgment, which was offered in October of `90. Mr. Spain, apparently, didn't get anybody to talk about this until over three years later. For that, it is just not proper evidence, Your Honor.
What the trial judge is saying is that he has no confidence in the basis upon which *391 Mr. Williams opinion is grounded, which is a decision within the discretion of the trial judge to make (see authorities discussed later in this section of the opinion), and we find no abuse of the trial judge's discretion in this regard.
At this point in the trial Spain's attorney again asked to proffer Mr. Williams' testimony, but he was again rebuffed by the trial court:
THE COURT:
I agree. Mr. Williams did probably the best he could under the circumstances and for what he was hired. However, what the Court is saying is I am going to sustain the objection based upon the evidence, the hard evidence that is before the Court; that is, the original survey which was some 17 years prior to the actual sinking of the vessel or thereabouts and that the retrospective survey which was done some four years after. Based upon that, even in a proper situation, I feel that that tends to mislead and miscatergorize the whole testimony and the whole situation of the incident. [Emphasis added.]
Again, the trial judge offers good reasons to support his lack of confidence in the foundation upon which Mr. Williams' opinion is based.
Mr. Smith's attorney then made another attempt to proffer:
MR. HARDIN:
May we proffer documentation into the record with regard to his testimony and photographs that he would have seen, his report, other yachts that he would have valued in terms of listing, that type of thing?
Again, the trail court disallowed the request to proffer. However, the trial court did allow Mr. Spain's attorney to continue questioning Mr. Williams on the record:
BY MR. HARDIN:
Have you done retrospective valuations of vessels before?
A. Yes.
Q. Do you feel qualified? Do you feel that it is appropriate to do a retrospective valuation of this vessel?
A. I felt so.
MR. HARDIN:
Your Honor, at this time, what I would like to do is offer, file, and introduce into evidence those items that this gentlemen would have reviewed which include the photographs of the vessel, videotape of the vessel, his report, the 1976 report. That's pretty much it.
MR. GUTIERREZ:
Judge, I object. All of those things are not relevant. No foundation was laid for the equipment that he has a list of equipment on his vessel for this man to look at from 1993 that is sitting on the Chef Pass that we don't know if, in fact, it had that equipment on there. There is nobody here to testify to that. So, this is all a what if they had that stuff and what if this. This would be his conclusion. Williams because that's all he has got is what if this boat looked like this, what if it had this equipment, and what if that would you then say that. I think, that's all speculative and not there is no evidence to all of that.
Once again the trial court denied the proffer, but allowed Mr. Smith's attorney to continue his questioning of Mr. Williams, during the course of which Mr. Williams explained that wooden boats are highly prized because so few have been built since fiberglass became popular in the 1950's. According to Mr. Williams, the wooden boats were hand built, implying a high degree of craftsmanship from which substantial pride of ownership could be derived. In other words, there was a considerable *392 factor of aesthetic (La. C.C. art. 1998 employs the term, "nonpecuniary," while the term "esoteric" was employed in the trial court) enjoyment in connection with the ownership of a wooden boat according to Mr. Williams. Eventually, Spain's attorney again turned the testimony to the condition of the boat, but the Court refused to allow Mr. Williams to express an opinion of value based on a photograph of the vessel taken prior to the time it sank, but not immediately prior to that time.
Spain's attorney then tried to have Mr. Williams qualified as an expert on the duties of a "consent keeper." Sheriff Stephens' attorney objected. Based on the fact that Mr. Williams testified that, in essence, he had performed such duties only twice before, the trial court refused to qualify him as an expert. Additionally, the duties of a keeper are a matter of law, not a matter of Mr. Williams' opinion.
Next Spain's attorney asked to have Mr. Williams testify as to what it would cost to bring the vessel back to the condition it was in prior to the sinking based on Mr. Williams having seen it in 1993. In refusing this request from Spain's attorney, the trial judge stated:
Again, we don't know how much deterioration occurred from the time of seizure to the time he saw it. That is purely speculation [[5]], you know. We are at a point in this matter where we cannot ask this gentleman to give us any indication of that. There are other means of doing that. Counsel, I am not going to practice law for you. You know, this gentleman is not at this point in time some four years later capable of saying what it's going to take to get that issue.
At this point Spain's attorney again attempted a proffer, and again the trial court refused. Finally, the trial court permitted Mr. Williams to offer additional expressions of his opinion regarding the "esoteric" value of the boat, in spite of the fact that the trial court expressed the following reservations about his qualifications in that area:
His expertise as a surveyor does not deal with the esoteric nature of individual owners nor can he form an opinion as to what is in the mind of an individual owner at any point in time.
From the extensive portions of the transcript quoted throughout this discussion of the proffer issue it is apparent that the trial court, while not allowing Spain to make a complete record of the evidence he sought to proffer, did effectively allow Spain to make the equivalent of a statement setting forth the nature of the excluded evidence. As may be seen by reference to the aforementioned quoted portions of the transcript, Mr. Williams was even allowed to state his conclusion that the vessel was worth $20,000.00 at the time it was sequestered. The testimony that Mr. Williams was allowed to put on the record along with the argument Spain's counsel made on the record, make the nature of the excluded evidence abundantly clear. This is sufficient to comply with La. C.C.P. art. 1636 and Martin v. Esponge, supra.
Anderson v. Casualty Reciprocal Exchange, (La.App. 2 Cir.1992), 602 So.2d 282, does not support Spain's position. In Anderson the trial judge did not allow the appellant either form of proffer mandated by La. C.C.P. art. 1636. The same is true in Michelli v. Michelli, 93 2128 (La.App. 1 Cir. 5/5/95), 655 So.2d 1342. It is error to deny a party both forms of proffer. In the instant case Spain was effectively allowed to make a statement and the record also *393 includes much of the testimony Spain sought to get into evidence, including his expert's conclusion that the vessel had a value of $20,000.00 at the time of sequestration. Therefore, we find no error in the trial court's rulings concerning Spain's proffer of Mr. Williams' testimony and evidence.
Moreover, had the trial court allowed the proffer, this court would not have reversed the trial court's decision to exclude the evidence. The reasoning of the court in Gordon v. Levet, 96-600 (La.App. 5 Cir. 1/15/97), 688 So.2d 57, 63 based on analogous facts, is applicable in this case:
In the instant case, we have already concluded that the trial judge did not abuse his discretion in refusing to allow amendment of the pre-trial order, and in excluding the testimony at issue on the basis that the witnesses were not named in that order. Thus, even if the trial court had allowed the proffer, we would not have considered the testimony in this appeal. Therefore, the trial judge's refusal to allow the proffer, under the circumstances of this case, is harmless error. [Emphasis added.]
Based on Gordon, supra, even were this court to assume for purposes of argument that it was error to disallow the Spain proffer, then the error was harmless because the trial court would have been acting within its discretion in disallowing the evidence, and/or in choosing to give it no weight, and/or in refusing to qualify Mr. Williams as an expert to place a value on Spain's non pecuniary loss.
The weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. Quinones v. United States Fidelity and Guaranty Company, 93-1648 (La.1/14/94), 630 So.2d 1303, 1308; Schiro v. State ex rel. Dept. of Transp. and Development, 99-2754 (La.App. 4 Cir. 3/21/01), 808 So.2d 500, 508, writ den. 01-1371 (La.6/22/01), 794 So.2d 795. Even uncontradicted expert testimony is not binding on the factfinder. Mossy Motors, Inc. v. Sewerage & Water Bd. of City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 9/19/01), 797 So.2d 133, 136, writ den. 01-2809 (La.1/4/02), 805 So.2d 203; Hansel v. Holyfield, 00-0062 (La.App. 4 Cir. 12/27/00), 779 So.2d 939; J.A.G. v. Schmaltz, 95-2755 (La.App. 4 Cir. 10/23/96), 682 So.2d 331, 337.
Glass v. Magnolia School, Inc., 01-1209 (La.App. 5 Cir. 3/13/02), 815 So.2d 143, 153-154, writ den. 02-1048 (La.6/7/02), 818 So.2d 776, demonstrates the worthlessness of an expert opinion not based upon a reliable foundation:
Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record. [Footnote omitted.]
In the present case, the record is devoid of any evidence that Wayne had a history of seizures, that he had ever suffered from any condition causing seizures, or that he had, in fact, ever experienced one. In short, Dr. Neuman had no more evidence on which to postulate a seizure than he did in ruling out diabetic blackout or heart attack. Because Magnolia presented no evidence that Wayne suffered from any conditions which would cause him to suddenly lose consciousness, Dr. Neuman's opinion was speculative at best. It has been held that a factfinder may not infer the existence of a defect based on the fact that an accident has occurred. [Footnote omitted.] Analogously, *394 we hold that a factfinder may not infer the existence of one medical condition based solely on the lack of another explanation for an occurrence. To the extent that it did so, it was error for the jury to assign much weight to Dr. Neuman's conclusion.
Just as Dr. Newman's opinion in Glass is speculative at best, Mr. Williams' valuation of Spain's vessels in the instant case is speculative at best because it is based on information so far removed in time from the relevant valuation date.
Included in the credibility determination is the method by which the expert reached his conclusions. Annina v. Eschette, 00-1892 (La.App. 1 Cir. 11/21/01) 814 So.2d 13.
It is well settled in Louisiana that the trial court is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. Fountain v. Fountain, 93-2176, p. 5 (La.App. 1 Cir. 10/7/94), 644 So.2d 733, 738. A trial court may accept or reject in whole or in part the opinion expressed by an expert. Id. The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Williams v. Rubicon, XXXX-XXXX (La.App. 1 Cir. 2/15/02), 808 So.2d 852. [Emphasis added.]
Lanasa v. Harrison, 02-0026 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605, writ den. 02-2512 (La.11/27/02), 831 So.2d 286.
As the effect and weight to be given to Mr. Williams' testimony is within the broad discretion of the trial judge, it was harmless error, if error at all, for the trial judge to exclude from both evidence and proffer Mr. Williams' expert opinion when it is apparent for good and valid reasons, fully articulated by the trial judge in the transcript, that had the Mr. Williams' opinion been allowed in, the trial judge would have given it no weightand this Court would not have second guessed the trial court on appeal.
Mr. Williams was qualified as an expert marine surveyor, but was rejected as an expert on the aesthetic[6] or non pecuniary[7] value of the boat. The trial judge has wide discretion in deciding which expert testimony to admit and his judgment will not be disturbed unless clearly erroneous. Collins v. State ex rel. Louisiana Health Care Authority, 99-2308 (La.App. 4 Cir. 7/12/00), 774 So.2d 167, 172; Mistich v. Volkswagen, 95-0939 (La.1/29/96), 666 So.2d 1073. As to the issue of who should or should not be allowed to testify as an expert, it is very well established in the case law that the trial court has discretion and will not be reversed on appeal absent clear error. Doe v. Archdiocese of New Orleans, XXXX-XXXX (La.App. 4 Cir. 5/8/02), 823 So.2d 360, 363, writ den. 02-1960 (La.11/8/02), 828 So.2d 1127.
Regarding certain pictures and a video of the boat, along with a list of equipment supposedly on the boat that Spain was also prevented from proffering in connection with Mr. Williams' testimony, it still comes back to the fact that the trial judge expressed no confidence in Spain's expert and gave more than ample reasons on the record to allow us to conclude that the trial judge was acting well within his discretion in rejecting the evidence of the expert and that the pictures and the video would have not changed the trial judge's decision in that regard. In other words, regardless of whether the trial judge had allowed the proffer of the pictures and video, or even if he had allowed them to actually be introduced *395 into evidence, the result remains the same because the trial judge had no confidence in the process whereby the expert sought to value the vessel, the trial judge gave valid reasons to support that position, and the video and pictures would not have changed the thinking of the trial judge, nor would they have invalidated his reasoning. There is no abuse of discretion where the trial judge as fact finder chooses to give no weight to an expert valuation premised on a one-time observation of a vessel four years after the valuation date and a survey of the vessel admittedly done over fifteen years prior to the valuation date. Therefore, questions concerning whether the evidence and testimony should have been admitted or proffered become irrelevant where they have no impact on the outcome of the case under harmless error analysis.
Spain offers an additional reason why it was error for the trial court to disallow certain photos and a video of the vessel: He contends they should have been allowed in because mention of them was made in the Court's Case Management Order. The attorney for Sheriff Stephens objected on the basis that they had not been produced in response to the request for production. The Sheriff appears to be correct on this point. Therefore, it was within the trial court's discretion to disallow the evidence. Regardless, as stated in the previous paragraph, neither the picture nor the video would cure the valid objection of the trial judge concerning the speculative nature of Mr. Williams' attempt to value the vessel. Accordingly, were there any errors in the trial court rulings excluding the photos and the video, they were harmless.
It is clear that even had the trial judge allowed all of Mr. Williams' evidence and testimony into evidence, he would have disregarded it. The trial judge's excellent reasons for refusing to place any value on Mr. Williams' expert opinion, that Mr. Williams' opinion was based on a survey of the vessel done over fifteen years prior to the valuation date and that Mr. Williams' did not actually observe the boat until approximately four years after the valuation date, demonstrate that the trial court acted well within its discretion in making its decision to exclude the evidence.

II. IS SPAIN ENTITLED TO RECOVER DAMAGES PURSUANT TO HIS RECONVENTIONAL AND THIRD PARTY DEMANDS?
Spain filed a reconventional demand against the Marina, its owner, Berthelot, and the Sheriff asking for damages sustained by his vessel during the time it was seized under sequestration. He has not asserted a claim for wrongful seizure. Instead his claim is based on allegations that the defendant in reconvention and the third party defendants failed in their duty to properly maintain the vessel while it was under their control pursuant to the seizure. The burden is on Spain to prove his damages.
The record is replete with evidence that the vessel had sunk at least twice prior to its seizure, that Spain made no effort to maintain it, and that both before and after seizure it was the object of virtually constant bailing efforts which were ultimately unsuccessful. Spain failed to prove the condition of the vessel prior to sequestration. Spain himself testified that all of his belongings inside of his boat were wet prior to the sequestration, from which the trial judge could reasonably infer that the boat had been taking on water. The boat was never operated during the entire time it was at the Marina, a period of several years, and the only reasonable inference to be drawn from the record is that it was not *396 operational for several years prior to the sequestration. It was towed into the Marina (it was not operational when it arrived) initially in 1986 and was never seen to be operational after that date through the time of the sequestration in 1989.
After the sequestration was released in October of 1990, Spain refloated the boat and moved it first to the Chef Pass Marina and then to Chuck's Marina where he eventually relinquished the boat to the marina and gave his permission to have it disposed in any manner the marina chose.
Spain contended that the value of the vessel's wood (teak) alone was $30,000.00, but even his expert placed a value on the entire vessel of only $20,000.00. Spain was out of town much of the time the boat was at the Gulf Outlet Marina. Therefore, he has little real first hand knowledge of what went on in connection with his vessel in his absence from town. This in turn undermines the persuasive authority of his entire testimony.
The deplorable condition of the vessel antedated the sequestration. The preponderance of the evidence in the record supports a finding that the boat was a useless, non-operational, valueless, sinking wreck prior to the sequestration. Therefore, Spain has failed to prove that the vessel suffered any loss in value as a result of the sequestration. It was entirely within the discretion of the trial judge to discount Spain's self-serving testimony as to the value and condition of the vessel, especially in view of the fact that the rest of the record did not support it and there was much in Spain's testimony that could lead a reasonable fact finder to find it unreliable. In other words, under a manifest error standard of review, there is nothing in the record that would permit this Court to second-guess the trial court's implicit findings regarding the lack of persuasive power of Spain's testimony. For reasons explained earlier in this opinion, Spain's expert was equally unpersuasive.
As Spain failed to prove any economic or non pecuniary loss, we need not address the various theories of liability he asserts against the defendant in reconvention and the third party defendants.

III. SHOULD THE RENTAL CONTRACT BE REFORMED BECAUSE OF MUTUAL MISTAKE?
Spain notes that Carol Duplantis, a secretary at Gulf Outlet Marina and the party in charge of new boat rentals testified that the rental charge at the marina was based on $2.85 per foot. However, that would probably best be described as a rule of thumb, or as Mr. Berthelot testified: "It's kind of a guideline." It is not mentioned in the written rental agreement signed by the lessees, including Spain. The written agreement signed by Spain mentions the agreed upon monthly rental amount only.
Moreover, the footage upon which the rental amount is figured is supplied by the lessee. In the instant case Spain informed Ms. Duplantis that his boat was 50 feet long. Spain does not dispute this. On appeal Spain contends that subsequent to the time he signed the written rental agreement dated August 4, 1986, he learned that his boat was actually only 45 feet long. Spain testified that when he spoke to Mr. Berthelot about it he was told that it would be taken care of. However, Ms. Duplantis testified that no one ever spoke to her about this, including Spain who continued to make payments (when he made payments) at the rate called for in the original agreement. She testified that it was customary for lessees to bring rental complaints to her, but that Spain never *397 made any such complaint. When rental discrepancies were brought to her attention, she would ask Mr. Berthelot about them. She would not undertake adjustments on her own authority. She said that in her 21 years of working at the marina she had never seen a dispute as to the length of a vessel.
Mr. Berthelot testified that in Spain's case the rental was "more or less" based on the length of Spain's vessel. Mr. Berthelot could not recall having received a letter from Spain contesting the length of the boat, but he acknowledged his signature on the receipt for such a letter dated May 9, 1989. However, he stated that regardless he would not have lowered the rent on Spain's account because it was not current.
Viewing the record as a whole, including the written agreement signed by Spain and the testimony of the witnesses, we cannot say that the trial judge was manifestly erroneous in implicitly concluding that the length of the vessel was only a guideline in fixing the rent, and that the actual rent was as agreed upon between the parties and that, therefore, the facts do not support Spain's demand that the rental agreement be reformed. While a reasonable fact finder could take a different view of the evidence, it is not the function of this Court to prefer an alternative view of the facts when the one chosen by the trial court is not unreasonable.

IV. DID DAVID SPAIN SUPPLANT JOSEPH SPAIN ON THE RENTAL AGREEMENT?
Spain in his brief, in effect, does not contest the $908.00 calculation of rent due awarded by the judgment. Instead, Spain argues that $296.00 of this sum should not be charged to Spain, but to his brother David.[8]
Spain notes that La. C.C. art. 2685 provides that where a rental agreement has no stated term it is considered to be by the month. Spain's rental agreement with Gulf Outlet Marina has no stated term. Therefore, Spain contends that as a matter of law the agreement is by the month. From this Spain argues that when his brother David agreed to commence paying the rent in January of 1989, this agreement superceded the original agreement that Spain had entered into, i.e., Spain's had no future rental obligation from that day onward as long as his brother David was assuming the lease payments. Spain argues that the agreement with Spain's brother, David, was a novation, extinguishing Spain's original rental agreement. In his brief, Spain quotes the following colloquy from the transcript of Ms. Duplantis' testimony:
Q. You mentioned that the contract was changed to David Spain in January of '89?
A. Right.
Q. He took it over?

*398 A. He said, he would like to fill out, stay on the boat.
Q. So he took on the rent obligation of David Spain?
However, the part of Ms. Duplantis' testimony quoted by Spain fails to consider the explanatory testimony given by Ms. Duplantis immediately following the portion quoted:
A. .... The contract was still under Joseph Spain.
* * * *
A. I did not change the contract.
* * * *
A. There was no change in the contract, sir. The balance of the rent was still under Joseph Spain.
Spain's attorney asked Mr. Berthelot only two brief questions concerning this issue:
Q. You were aware that David Spain took over the rent, the brother of Joe Spain, took over the rent?
A. Yes, somewheres [ sic] in there.
Q. That was okay with you?
A. I didn't care who paid the rent, just so somebody would pay it. We take money from anybody that paid the rent.
Spain points to an account card in his name, Joseph Spain, with a line though a list of payments and an arrow pointing to the statement, "brother took over." Spain also notes a separate account card in the name of David Spain that commencing in January of 1989.
In reviewing the testimony of Ms. Duplantis and Mr. Berthelot, it must be remembered that they are not attorneys. Therefore, while Ms. Duplantis and Mr. Berthelot may have testified that David Spain "took over" the rent obligation, the trial court could reasonably infer that they did not infuse those words with the same legal connotations as Spain now urges this court to adopt. It is clear that there was never any intention to release Spain from his rental obligation. Nor was there ever any intention to substitute a new obligation for the existing obligation as is required for a novation under La. C.C. art. 1879 as cited by Spain. The payment of rent by David Spain during the period he was living on the boat was more in the nature of a sublease. It was not a novation. There is no question that at all times Spain remained the owner of the vessel, and as such was obligated to pay rent for occupying the slip at the marina.
While Spain relies on La. C.C. art. 1879, which does no more than define "novation," we note that the Civil Code Articles immediately following which explain when novation occurs make it clear that no novation has taken place in the instant case.
La. C.C. art. 1880 provides:
The intention to extinguish the original obligation must be clear and unequivocal. Novation may not be presumed.
Both Ms. Duplantis and Mr. Berthelot testified that there was no intention to extinguish the original obligation. Therefore, under the language just quoted from La. C.C. art. 1880, we find no manifest error in the implicit finding of the trial court that no novation had occurred.
There is no express declaration by the parties of an intention to novate, one of the means whereby novation may take place pursuant to La. C.C. art. 1881. Spain was *399 never discharged from his obligation by Gulf Outlet Marina, a prerequisite for novation under La. C.C. art. 1882. In fact, it is not reasonable to believe that Gulf Outlet Marina would ever intend to release Spain from the rental obligation as long as his boat occupied a marina slip.
There is no merit in this assignment of error.

V. WAS IT ERROR TO AWARD $1,500.00 TO GULF OUTLET MARINA FOR MAINTENANCE OF THE VESSEL?
The judgment of the trial court condemns Spain to pay Gulf Outlet Marina $1,500.00 "for the maintenance of the Defendant's boat." The maintenance referred to in the judgment is pumping services rendered by Mr. Alvin Dodd in an effort to keep Spain's vessel afloat. There is no dispute that the expenses were incurred prior to the sequestration of the vessel. Mr. Berthelot testified that although Mr. Dodd was an employee of the Marina, the work for which the $1,500.00 bill was submitted was performed by Mr. Dodd after hours on his own time.
There is nothing in the rental agreement giving the Marina the right to incur such expenses on Spain's account. None of the witnesses testified that Spain had agreed in general to be responsible for such expenses as part of the lease agreement, i.e., there is no evidence of any general prior authorization by Spain to incur such expenses. There is no evidence that Spain gave any authorization to have this specific work done. The Marina's brief refers to nothing in the law or record that would entitle the Marina to incur such expenses on Spain's behalf. Mr. Berthelot gave the only testimony on behalf of the Marina in this regard, and it proves nothing: "[Alvin Dodd] gave me a bill for it [the $1,500.00] because I thought we would be able to collect the money from Mr. Spain." Just prior to that Mr. Berthelot testified that the Marina's efforts to make contact with Spain to discuss the vessels problems with taking on water were unsuccessful. It is clear that Spain never explicitly agreed to these services.
However, La. C.C. art 2292 defines negotiorum gestio as follows:
There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances. [Emphasis added.]
1995 Revision Comment (b) under this Civil Code Article provides in pertinent part:
The affair managed may be a material act, such as the protection of property from fire or flood, or the execution of a juridical act, such as the sale of perishable things. [Emphasis added.]
Mr. Spain does not contend that there was any pre-sequestration duty on the part of the Marina to bail his boat. Therefore, the Marina's efforts to have Mr. Spain's boat bailed were voluntary in the eyes of the law. The bailing of Mr. Spain's boat by Mr. Dodd at the request of the Marina is very much analogous to the examples of protection of property from fire and flood set forth in the 1995 Revision Comment quoted above and should be treated the same way, as fire and flood are merely examples, not requirements. Additionally, the record supports a finding that the Marina acted "in the reasonable belief that the owner would approve the action if *400 made aware of the circumstances." La. C.C. art. 2292.
La. C.C. art. 2294 provides that:
The manager is bound, when the circumstances so warrant, to give notice to the owner that he has undertaken the management and to wait for the directions of the owner, unless there is immediate danger.
The record is replete with testimony concerning efforts by the Marina to communicate, albeit unsuccessfully, with Mr. Spain. The record supports a finding that La. C.C. art. 2294 was adequately complied with.
La. C.C. art. 2297 provides that:
The owner whose affair has been managed is bound to fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses. [Emphasis added.]
Under this article, the Marina is entitled to be reimbursed for the expense of bailing. The fact that the Marina retained the services of a third party to perform the bailing does not defeat its claim under negotiorum gestio.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Emphasis original.
[2] Emphasis added.
[3] Emphasis added.
[4] Emphasis added.
[5] Emphasis added.
[6] Mr. Williams used the term "esoteric."
[7] The term used La. C.C. art. 1998.
[8] Spain makes the following argument in his brief:

Ma. Duplantis in her testimony in fact separated the amount asserted to be owed. She said there was four months in 1998 (August to November) past due and then there were two months (June and July) in 1989, which would fall under David Spain's obligation. The rent thus due, based on [the Marina's] calculations, would be $612.00 by Joseph Spain (4 × $153.00) and $296.00 by David Spain ($153.00 + $143.00). David Spain was never sued by the defendants. Despite this the trial court rendered judgment over and against Joseph Spain for the sum of $908.00.
Thus, on appeal Spain questions the allocation of responsibility for the past due rent as between himself and his brother David, but he does not challenge the Marina's calculations.